Peter A. Arhangelsky, Esq. (SBN 025346)
Peter.Arhangelsky@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Rd., Suite 800
Phoenix, AZ 85016
Ph: (602) 445-8017
*Attorney for Plaintiffs Stenson Tamaddon, LLC,*
*and ERC Today, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ERC Today, LLC; and Stenson Tamaddon, LLC, | Case No. 2:24-cv-03178-SMM |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT** |
| John McInelly, et al., | |
| Defendants. | [Oral Argument Requested] |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   FACTS .................................................................................................2

   A.  The Employee Retention Credit .................................................2

   B.  IRS Issues Summary Denials Without Factual Support ....................5

   C.  IRS Changes ERC Procedure and Limits Appellate Rights............10

III.  LEGAL STANDARDS ........................................................................11

IV.   ARGUMENT ....................................................................................12

   A.  Plaintiffs Have a Strong Likelihood of Success on the Merits ........12

      1.   IRS Processing Methods Are Arbitrary, Capricious, and
         Conflict with Agency Policy ...............................................12

      2.   The IRS Violates Taxpayer Due Process and Statutory
         Rights .............................................................................16

   B.  Plaintiffs Face Irreparable Harm Absent Injunctive Relief............20

      1.   Irreparable Financial Harm ..............................................21

      2.   Reputational Harm ..........................................................22

      3.   Irreparable Constitutional Injury.......................................22

   C.  The Balance of the Equities Favors an Injunction .........................24

V.    CONCLUSION ................................................................................26

## **TABLE OF AUTHORITIES**

### **Cases**

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010) ........................................ 23

*Am. Promotional Events, Inc.--Nw. v. City & Cnty. of Honolulu*, 796 F. Supp. 2d 1261 (D. Haw. 2011) ............................................................................... 22

*Beltran Carrero v. Barr*, No. 20-CV-05522-DMR, 2021 WL 1164768 (N.D. Cal. Mar. 26, 2021) ......................................................................................... 11

*Best W. Int'l, Inc. v. Patel*, 523 F. Supp. 2d 979 (D. Ariz. 2007) .......................... 12

*Bufferd v. Comm'r*, 506 U.S. 523 (1993) .............................................................. 20

*Califano v. Sanders*, 430 U.S. 99 (1977) .............................................................. 13

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) .................................................. 21

*Cayuga Nation v. United States*, 594 F. Supp. 3d 64 (D.D.C. 2022) .................... 13

*Chaney v. United States*, 45 Fed. Cl. 309 (1999) .................................................. 20

*Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213 (D. Colo. 2007) .......... 25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440 (2024) ............................................................................................................... 12

*Ctr. for Biological Diversity v. Haaland*, 530 F. Supp. 3d 853 (D. Ariz. 2021) ........... 13

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ............................................................................................................... 13

*Doe v. U.S. Dep't of Just.*, 650 F. Supp. 3d 957 (C.D. Cal. 2023) ....................... 23

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ........................ 24

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) .............. 21, 25

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) .................................... 15

*Farm Sanctuary v. United States Dep't of Agric.*, 664 F. Supp. 3d 334 (W.D.N.Y. 2023) ............................................................................................. 15

*Fed. Commc'ns Comm'n. v. Prometheus Radio Project*, 141 S.Ct. 1150 (2021) .......... 13

*In re Martin*, 167 B.R. 609 (Bankr. D. Or. 1994) ................................................. 16

*In re Vestavia Hills, Ltd*, 630 B.R. 816 (S.D. Cal. 2021) ..................................... 13

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

*Jewell v. United States*, 548 F.3d 1168 (8th Cir. 2008) ................................ 21

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ........................................ 24

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ......................................................................................... 24

*Los Altos Boots v. Bonta*, 562 F. Supp. 3d 1036 (E.D. Cal. 2021) ................ 21

*McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regul. of Fla.*, 496 U.S. 18 (1990) ............................................... 16

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ..................................... 23

*Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032 (D. Mont. 2006) ................. 25

*Moody v. Michigan Gaming Control Bd.*, 847 F.3d 399 (6th Cir. 2017) ................. 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ................................................................ 13

*N. Cheyenne v. Hodel*, 851 F.2d 1152 (9th Cir. 1988) ................................ 25

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) .......................................................................... 16

*Oshkosh Truck Corp. v. United States*, 123 F.3d 1477 (Fed. Cir. 1997) ................. 19

*P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ............................................................................ 24

*Patlex Corp. v. Mossinghoff*, 771 F.2d 480 (Fed. Cir. 1985) .......................... 12

*Perlot v. Green*, 609 F. Supp. 3d 1106 (D. Idaho 2022) ................................ 11

*Protecting Arizona's Res. & Child. v. Fed. Highway Admin.*, No. CV-15-00893, 2015 WL 12618411 (D. Ariz. July 28, 2015) .............................. 25

*Scholl v. Mnuchin*, 494 F. Supp. 3d 661 (N.D. Cal. 2020) ...................... 14, 15

*Sherwin-Williams Co. v. United States*, 403 F.3d 793 (6th Cir. 2005) ................. 19

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ............................................. 11

*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989) ..................................... 25

*Stenson Tamaddon, LLC v. United States Internal Revenue Serv., et al.*, No. CV-24-01123-PHX-SPL (D. Ariz. July 30, 2024) ......................... passim

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Swierkowski v. United States*, 620 F. Supp. 149 (E.D. Cal. 1985) ................................. 17

*Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189 (9th Cir. 2013)............. 16, 19

*Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021)...................................... 26

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011)................................. 11

*Van v. LLR, Inc.*, 962 F.3d 1160 (9th Cir. 2020) ......................................................... 21

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005).................................................. 23

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................... 11, 24

*Xport Forwarding LLC v. Mesitis DWC LLC*, 694 F. Supp. 3d 1258 (C.D. Cal. 2023)......................................................................................................................... 22

## Statutes

5 U.S.C. § 706 ........................................................................................................ 12, 14

Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, §2301, 134 Stat. 281, 347-356 (2020) ...................................................... 3, 14

I.R.C. § 3134(c)(2)(A)(ii)(I) ...................................................................................... 3

I.R.C. § 3134(c)(2)(A)(ii)(II) ................................................................................... 14

I.R.C. § 6501(a)....................................................................................................... 19

I.R.C. § 6501(b)(2) .................................................................................................. 20

I.R.C. § 6514(a) ....................................................................................................... 10

I.R.C. § 6532 .............................................................................................. 10, 18, 21

I.R.C. § 7422 ................................................................................................... 10, 21

I.R.C. § 7803(a)(3) .................................................................................................. 18

I.R.C. § 7803(a)(3)(E) ............................................................................................. 18

## Other Authorities

Internal Revenue Manual § 21.5.3.4.1.1 ...................................................................... 9

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

## Rules

Fed. R. Civ. P. 65(a) ...................................................................................... 26

## Regulations

26 C.F.R. § 601.103(a) ................................................................................... 16

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Stenson Tamaddon, LLC ("StenTam") and ERC Today, LLC, pursuant to Rule 65(a) and the Scheduling Order in Dkt. 17, hereby move for an order preliminarily enjoining Defendants from processing ERC claims in violation of the Administrative Procedure Act (APA) and Fifth Amendment Due Process Clause.

## I.    **INTRODUCTION**

The American tax system is one of "self-assessment." *See* Verified Complaint, Dkt. 1 ¶195.   Taxpayers calculate tax liabilities through returns submitted under penalty of perjury. *Id.* ¶196.  The IRS then operates through an array of statutory authorities to examine those returns, issue summonses, assess and collect taxes, impose penalties and interest, investigate fraud, and so on.  Tax claims that are not audited are generally paid, and the IRS retains authority to revisit those claims retrospectively.  IRS has power to investigate tax filings years into the future, and the agency has no statute of limitations on the investigation of fraud. *Id.*¶¶195-198.  Through these time-tested systems, IRS processes over 271 million tax returns per year.[1]  The audit rate has generally been less than 1%.[2]

The IRS is taking an unjustifiably different approach with the Employee Retention Tax Credit (ERC).  IRS created a scheme to disallow ERC in mass, denying those refunds by using automated "filters" to make decisions without performing an individualized review. Dkt. 1 ¶¶80-133.  The IRS has conceded that it lacks sufficient information from taxpayers to make these decisions.  *Id.* ¶¶115-117.  It recognizes that its data filters are inappropriate to determine eligibility.  *Id.*  But the agency nonetheless uses this system to strip taxpayers of ERC refunds despite the known limitations.  Taxpayers have rights to money overpaid into the treasury and now improperly held by the IRS.  Arbitrarily denying financial relief under these circumstances violates the APA and Due Process clause.

The IRS also encumbers taxpayer rights to a prompt independent administrative appeal guaranteed by statute.  Dkt. 1 ¶¶207-241.  Defendants are funneling ERC appeals to

---

[1] *See* SOI Tax Stats – IRS Data Book, *at* https://tinyurl.com/Tax-Stats (summarizing 2023 data).
[2] GAO, "Tax Compliance: Trends of IRS Audit Rates and Results for Individual Taxpayers by Income," *at* https://www.gao.gov/products/gao-22-104960.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

revenue agents for eligibility evaluations only after first denying those claims. These post-denial examinations eat away at taxpayers' two-year statutory window to complete an administrative appeal. *Id.* ¶¶17, 207-209, 216-217. Because the IRS cannot complete an examination and appeal within that two-year window, taxpayers will be forced to pursue costly civil refund actions in district court. *Id.* ¶¶218-224. The IRS is betting that most businesses will instead forgo those expenses and walk away from legitimate ERC claims.

Plaintiffs are tax preparations services that are irreparably harmed when IRS summarily denies their clients' ERC claims. *Id.* ¶¶23-38. Plaintiffs' revenues depend on refund money paid to their clients. *Id.* ¶¶26-27. The IRS's new processing rules force Plaintiffs to incur substantial compliance costs without compensation. *Id.* ¶¶250-252. These IRS policies also fracture Plaintiffs' business relationships and damage goodwill and credibility with clients. *Id.* ¶¶255-256.

Plaintiffs have no ability to recover financial damages in this case. Their injuries cannot be remedied at the close of litigation. Preliminary injunctive relief is warranted. The Court should enjoin IRS from use of improper processing rules that deny ERC claims through unsupported boilerplate denials.

## II.    FACTS

### A.    The Employee Retention Credit

Congress passed the ERC as a stimulus for businesses impacted by COVID-19. Dkt. 1 ¶¶45-54. The credit encouraged employers to retain and rehire employees when federal, state, and local governments closed commerce through widespread lockdown orders, social distancing measures, and other limitations. *Id.* By retaining employees under that stimulus package, Congress intended to prevent widespread unemployment, raids on social services, and an ensuing economic downturn. *Id.* ¶¶49, 52-53.

Businesses qualify if their "operation of [a] trade or business" was "fully or partially suspended … due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

[COVID-19]." *Id.* ¶74.[3]  Congress also made any employer eligible if it suffered a percentage decline in "gross receipts" in certain 2020 and 2021 calendar quarters when compared to the same quarters in 2019.  I.R.C. § 3134(c)(2)(A)(ii)(I).

Congress successively broadened the ERC program through amendments. *Id.* ¶¶50-53.  In 2020 legislation, Congress called the program the "employee retention and <u>rehiring</u> credit," which signaled its intent not just to incentivize businesses to keep employees, but to give stimulus money to resume operations even after pandemic burdens faded. *Id.* ¶¶52-53.[4]  Congress's message was clear:  the ERC should be interpreted to provide broad relief during a time of crisis.

Without the benefit of public comment or rulemaking, the IRS set procedures for seeking that credit. *Id.* ¶¶134-136.  Employers claimed ERC through an amended quarterly return filed in hardcopy (i.e., Form 941-X). *Id.* ¶¶120, 134-135.  IRS could have created a new application form for ERC as it did with other tax programs. *Id.* ¶¶139-140.  It could have revised the Form 941-X to require more information from employers. *Id.*  It exercised none of those options. *Id.*

The IRS's chosen procedure created an information deficit and processing delays. *Id.* ¶¶86, 105-106, 141-146, 168.  IRS did not collect the information needed to evaluate employer eligibility under the ERC. *Id.* ¶¶113-117, 143.  For instance, it did not require employers to specify whether they claimed ERC under the "government orders" test or the "gross receipt decline" test. *Id.* ¶¶106, 109, 112, 117, 128-130, 143, 176.  It did not require reporting of quarterly wages in comparison with prior tax years—data that would be necessary to evaluate gross receipt declines. *Id.* ¶¶106, 136, 139, 149-153, 155.  IRS did not ask employers to identify the government orders impacting each business. *Id.*  It did not seek information on whether employers fell within an aggregated control group. *Id.* ¶158.  IRS also advised employers not to submit substantiation for their ERC claims. *Id.* ¶¶136-

---

[3] *See* Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, §2301, 134 Stat. 281, 347-356 (2020), as amended, I.R.C. § 3134(c)(2)(A)(ii)(I).
[4] Congress also required IRS to broadly promote the ERC through a public relations campaign.  Dkt. 1 ¶56.  The Biden Administration encouraged employers to pursue ERC claims, and IRS management reportedly estimated in 2022 that between 70%-80% of small and medium sized businesses were "good candidates for the ERC." *Id.* ¶¶55-57.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

138.  It explained in the Form 941-X instructions and Notice 2021-20 that employers should withhold that information.  *See* Exh. 14, Dkt. 1-2 at 54-55 ("Don't send these statements to the IRS.  Keep them for your records…"); Dkt. 1 ¶138 (citing Exh. 8, Dkt. 1-1 at 116).

The system of paper filings quickly led to a backlog of pending ERC returns.  Many IRS offices closed during the pandemic, which delayed mail processing.  Dkt. 1 ¶78 n.15.  IRS employees were tasked with tabulating data from millions of hardcopy tax filings.  Because the IRS initially expected most small- and mid-size businesses to qualify for ERC, the agency proceeded accordingly by processing ERC claims at a rate of about 40,000 per week.  *Id.* ¶¶ 55, 57.  The IRS eventually processed 3.6 million ERC claims, most of which IRS cleared using information in the Form 941-X.  *Id.* ¶¶15, 57, 92 n.17, 205 n.28, 228.  For most employers, the Form 941-X was all that IRS needed to process those ERC claims.  *Id.* ¶205 n.28.  That form included an attestation by taxpayers that they were eligible for the credit.

The agency's interest in paying ERC claims waned over time.  *Id.* ¶¶80-82.  IRS employees also expressed concern over a potential increase in the volume of claims after Congress expanded the program.  *See* Exh. 22, Dkt. 1-4 at 95 ("we might see a very high volume of adjustments").  Although recognizing that expanded eligibility would cause higher filing volumes, the IRS still took no significant action to streamline the filing process or ease administrative burdens by moving off paper submissions.  Dkt. 1 ¶¶80.  Instead, IRS began searching for ways to prematurely terminate or limit the credit.

In September 2023, the IRS issued a "moratorium" on processing ERC claims.  *Id.* ¶¶80-82.  It told taxpayers that processing times during the moratorium would be around 180 days.  *See Stenson Tamaddon, LLC v. United States Internal Revenue Serv., et al.*, No. CV-24-01123-PHX-SPL (D. Ariz. July 30, 2024) ("*StenTam*"), Dkt. 1-2 at 5.  But the agency instead stopped all ERC processing for a period of more than ten months.  Dkt. 1 ¶¶83-84.

In recent litigation, the IRS justified its moratorium by professing a need to individually review ERC filings.  Exh. 1, Dkt. 1-1 at 16:7-10 ("[T]his process is going to take a lot longer than it took beforehand because of all these ineligible claims that are being

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

filed and ***because the IRS is now taking a closer look at every single claim***.") (emphasis added); *id.* at 49:20-25 ("And that's why there's such delays, is ***they're taking a look, a harder look at all those claims***") (emphasis added).  IRS said it would take "a harder look at every single claim to make sure." *Id.* at 50:15-18.[5]  "[T]hey're doing more follow-up … with the taxpayers about the amount of gross receipts; what sort of state, local, or government orders they're relying upon in claiming the ERC.  They're requiring more information about the number of employees they had on their payroll to make sure that they qualified." *Id.* at 51:1-7.[6]

Although IRS lacked sufficient data to evaluate eligibility, it nonetheless told the district court that its data showed outrageously high rates of ineligibility within the program. *Id.* ¶¶88-92. IRS stated that up to 90% of pending ERC claims might be ineligible.  *Id.* ¶91. It has consistently refused to explain how it calculated "ineligibility" in that context.  The IRS instead claims that its rules for evaluating ERC claims are "privileged." *Id.* ¶¶121-122.

## B.    IRS Issues Summary Denials Without Factual Support

Although the IRS justified its moratorium on the need for individualized review, those activities never occurred.  Instead, IRS devised processing rules to deny ERC claims without reviewing each employer's circumstances.  *Id.* ¶¶7, 98-102, 247.

The ERC is a complex credit that demands a case-by-case evaluation of an employer's unique circumstances.  *Id.* ¶110.  The agency could have used analytics to identify a narrow subset of claims for examination, and then processed the remainder consistent with prior practice.  Instead, the agency developed a scheme it called "Disallowance During Processing," where the agency uses automated systems to deny ERC claims based on undisclosed software "filters."  Dkt. 1 ¶119 (quoting Exh. 31 at Dkt. 1-5 at 17).  IRS scanned all hardcopy ERC returns.  Exh. 7, Dkt. 1-1 at 111.  Then, under the Disallowance During Processing program, it applies software filters to screen those scanned

---

[5] *See also* Dkt. 1 ¶87 (citing Exh. 1 at 16:7-10, 36:14-22, 37:19-38:5, 43:15-18, 49:12-16, 49:20-25, 50:15-18, 51:1-7, 52:6-11, 61:20-24).

[6] When IRS announced the moratorium, it also understood that IRS might need to "seek additional documentation from the taxpayer to ensure it is a legitimate claim." *See* IRS IR-2023-169, *StenTam*, No. 2:24-cv-001123, Dkt. 1-2 at 3.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1    returns. *Id.* ¶¶104, 114, 118-120. Those "filters" process the data from taxpayer Form 941-

2    Xs using tax information known to IRS.

3         The IRS at first used this technology to make initial projections about the scope of

4    eligible claims in its backlogs. *See* Dkt. 1-1 at 114. But IRS had never used those analytics

5    to make actual ERC eligibility decisions, in part, because those filters could not make

6    reliable conclusions without more information from taxpayers. Dkt. 1 ¶¶96-133.

7         Defendants knew this proposed system was unsuitable but chose to proceed despite

8    those concerns. On January 12, 2024, the IRS dispatched an internal "Leadership Decision

9    Tracker" that outlined key decisions from IRS leadership. Dkt. 1 ¶114. Defendants sought

10   to "begin disallowing pre-refund claims based on tests performed" using the agency's

11   flawed analytics. *Id.* (noting that IRS's "examination team established several entity level

12   filters that test the taxpayer's eligibility"). But the agency also recognized that its proposed

13   filtering system computed only an "*expected* adjustment for each tax module … based on

14   information available to IRS from the Form 941 and other filings." *Id.* Decisions based on

15   those filters were therefore speculative at best.

16        The IRS observed that its system had "limitations" because the "[a]vailable data does

17   not always facilitate precise computations." *Id.* ¶115. Defendants therefore explained that

18   this system would be inappropriate to reach eligibility decisions under the ERC:

19        **These tests do not assess the employer's *eligibility* to claim the credit**.
20        The test results are used to identify those claims that will be classified for
         examination by an examiner. The classifier may upon a review of the claim
21        choose to accept the claim as filed or select it for examination.

22   *Id.* (emphasis original and added). The IRS conceded that, "Any consideration of reviewing,

23   adjusting and/or releasing claims using return information available to the IRS that has not

24   been verified through direct interaction with the filers has limitations." *Id.* ¶116.

25        In internal documents, the IRS again conceded that "The data to conduct eligibility

26   tests *is not collected on employment tax returns*," partly because "[d]ata required for

27   eligibility varies geographically due to government orders ranging by city, county, and

28   state." *Id.* ¶117. By IRS's own admission, it lacks information required to make ERC

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1   "eligibility" decisions without seeking more information from the taxpayer. *Id.* ¶¶114-117,

2   141-143. The IRS therefore had actual knowledge that use of its filters to disallow taxpayer

3   ERC claims was not supportable.

4       Echoing those concerns, the TIGTA[7] also concluded in a September 2024 audit of

5   IRS systems that, "Specifically for the ERC, the IRS ***does not have all the data it needs to***

6   ***verify the eligibility*** of the employer to claim the credit or accuracy of the claims by

7   employers for the ERC." *Id.* ¶143 (quoting Exh. 15, Dkt. 1-2 at 84-85) (emphasis added).

8   According to the TIGTA, "the only way the IRS could determine if an employer met these

9   eligibility criteria would be through a resource-intensive examination, which would require

10   the employer to cooperate and provide the necessary documentation for the IRS's review."

11   *Id.* An individualized review is therefore necessary if the IRS plans to deny an ERC claim.

12   Indeed, the IRS promised the district court that it would exercise this level of diligence

13   during the moratorium. Dkt. 1 ¶¶6, 87, 98-99.

14       Yet despite those known limitations, in July 2024, the IRS began issuing boilerplate

15   disallowances on ERC claims, denying tens of thousands of pending claims using its flawed

16   filters as the sole basis for decision. *Id.* ¶118. Those disallowances proceed through a Letter

17   105-C notifying the taxpayer that its ERC claim was denied. *Id.* ¶¶102, 124.[8] The 105-C

18   disallowance is an agency determination that a taxpayer is ineligible. *Id.* ¶¶102, 124, 207,

19   213. The boilerplate 105-C letters do not include specifics regarding the reasons for denial

20   other than the following conclusory statement:

21       Our records indicate there were no government orders related to COVID-
22       19 in effect during the quarter(s) you claimed ERC which could have fully
        or partially suspended your trade or business. Our records also show you
23       do not meet the required decline in gross receipts.

24   *Id.* ¶102. The IRS dispatched those summary denials by the tens of thousands, and it

25

26   ───────────
     [7] Treasury Inspector General for Tax Administration (TIGTA).
27   [8] A Letter 105-C is a "Claim Disallowance" letter providing "legal notice that the IRS
     is not allowing the credit or refund" claimed. *See, e.g.*, TAS, "Letter 105 C, Claim
     Disallowed," *at* https://www.taxpayeradvocate.irs.gov/notices/letter-105-c/. These letters
28   are customarily issued when a claim is facially deficient, for instance, when a taxpayer files
     a claim beyond the limitations period. *Id.*

publicly declared an intent to continue these tactics for hundreds of thousands of ERC claims. *Id.* ¶239.

Although the IRS's automated filters supply the basis for agency decisions, the IRS refuses to disclose the contents of those rules. *Id.* ¶¶121-122. The IRS instead claims that its filters are "privileged" and therefore non-public, including all "criteria indicating improper ERC claims, the method of assigning risk levels to ERC claims, the method of processing ERC claims based on various risk levels, and the refinement of risking treatment as data on ERC claims has been collected." *Id.* In other words, although the IRS is using these "filters" as its decisional basis to deny employer ERC claims, the agency concurrently refuses to disclose specifics about those filters and how they function. *Id.*

However the IRS characterizes these filters, it cannot justify ERC denials without having more information from taxpayers. *Id.* ¶¶142-143. To verify an ERC claim under the gross receipts test, IRS must determine whether an employer suffered a qualifying decline in gross receipts in comparison to corresponding financial *quarters* in 2019. *Id.* ¶151. But the Form 941-X did not require employers to report that information, and IRS lacks data on quarterly receipts through other tax submissions. *Id.* ¶106. IRS therefore cannot determine whether a business qualifies under the gross receipts test based solely on the information IRS requested in the Form 941-X.

The IRS stated in its 105-C Letters that agency "records … show you do not meet the required decline in gross receipts." *Id.* ¶¶102, 154, 159. That statement was grossly misleading at best. *Id.* ¶¶148-149. The IRS either lacks a factual basis for that assertion, or it makes these decisions based on employers' *annual* income tax returns. *Id.* But annual income would not reveal essential inputs like quarterly receipts, whether an employer is part of an aggregated control group, or whether an employer uses the alternate quarter election. *Id.* ¶¶149-153. IRS's use of annual income data therefore caused erroneous decisions when it denied ERC claims for employers that were obviously eligible. *Id.* ¶¶154-156, 159-164.

The IRS also lacks information on government orders that impacted employers. *Id.* ¶¶175-176, 125-130. To verify eligibility under the government orders test, the IRS would

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

need to analyze the specific effects of pandemic orders on a business's normal operations, supply chains, customers, and other indirect impacts. *See* Dkt. 1 ¶¶72-79. Although the IRS wrote that it possesses "records indicat[ing] there were no government orders related to COVID-19" in certain quarters, the IRS apparently never performed the required analysis of government orders impacting employers. *Id.* When confronted with a FOIA request seeking agency records supporting these summary denials, the IRS could not produce documentation showing that it performed the necessary analysis. *Id.* ¶¶125-130; *see also* Dkt. 1 ¶117 (explaining that IRS lacks an ability to verify eligibility for government orders claims because "[d]ata required for eligibility varies geographically due to government orders ranging by city, county, and state"). Here, too, the IRS filters led IRS to erroneously deny ERC claims. *Id.* ¶¶181-193. IRS could not have known which government orders affected businesses during the relevant quarters because it lacked even basic information, including the format of each employers' business and the geographic regions where they operated.

Given the known error rates in IRS summary disallowances, and the agency's inability to support its processing filters, organizations like the TAS[9] were quick to report that "IRS may have problems with its risk-scoring filters." *Id.* ¶13. The TAS also noted that, "The manner in which the IRS generated this most recent batch of ERC disallowances and the process the IRS will use to review taxpayers' responses to these denials ***deviates significantly from normal IRS procedures***." *Id.* ¶11 (emphasis added). IRS procedures, outlined in the Internal Revenue Manual (IRM), specifically require the agency to request additional information from taxpayers before denying refund claims. *Id.* ¶¶197-198. According to IRM § 21.5.3.4.1.1, if the IRS receives an amended return or claim for credit without sufficient information, the agency is instructed to contact the taxpayer for clarification. That process, which IRS is not following, ensures taxpayers have a fair opportunity to provide missing details before IRS renders a decision. *Id.* ¶¶199-200.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

---

[9] Taxpayer Advocate Service (TAS).

### C.    IRS Changes ERC Procedure and Limits Appellate Rights

Prior to the 2023 moratorium, if IRS had concerns with ERC eligibility, it first sought more information from taxpayers either through an examination or otherwise.  *Id.* ¶¶10-13, 195-199.  IRS now abandons that procedure in favor of summary denials.  *Id.* ¶¶207-228. Under that reformatted procedure, IRS opens an examination only if a taxpayer requests review following a formal denial: "If you don't agree with us disallowing your claim, you need to respond to the [Letter 105-C] with additional documentation to support your eligibility and claim amount." *Id.* ¶¶208, 212-213.  "If you request an appeal, we will first consider your explanation and documents ***before sending your request to the IRS Independent Office of Appeals***." *Id.* (emphasis added).  That process conflicts with the IRM, which instructs the agency to provide a "prompt [appellate] conference and decision [to] enable the taxpayer to know with the least amount of delay, the final decision of the IRS as to the amount of tax liability[.]" *Id.* ¶214.

The 105-C disallowance also triggers a taxpayer's two-year statutory window to complete an administrative appeal before needing to file a civil refund action in federal district court. *Id.* ¶¶216-217.  Under I.R.C. §§ 6532 and 7422, taxpayers must complete their administrative appeal or file a civil refund action within that time or they lose their refund. *See* I.R.C. § 6514(a).[10]

Within the ERC program, administrative appeals are already taking more than 14 months to complete.  Dkt. 1 ¶219.  IRS ERC examinations separately require between 15 and 21 months. *Id.* ¶¶218-219.  Adding an IRS examination onto the appeal means taxpayers receiving a 105-C disallowance will not have enough time to complete the administrative appeal before the two-year limitations period lapses. *Id.* ¶¶218-224.  That untenable timeline forces taxpayers to either abandon ERC claims or incur significant costs in a civil refund action. *Id.* ¶¶218-227.  For employment tax returns, recent IRS data also shows the IRS closed just 6,494 appeals in fiscal year 2021.  Dkt. 1 ¶223.  Even if the IRS can increase

---

[10] *See also* TAS, *supra* note 7, "[A]s you approach the end of the two-year period … you may want to file a timely suit to protect yourself.  Failure to timely file suit means that even if Appeals ultimately concludes your claim was correct, you will not receive a refund or credit if Appeals reaches its decision after the period for filing suit has expired."

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1    proficiency, it lacks the means to complete the "resource-intensive examination[s]" called

2    for by the TIGTA. *Id.* ¶143.  The TAS also noted the potential "ping-pong" effect within

3    IRS: "Taxpayers should anticipate it will take many months, or even longer, before the IRS

4    makes a determination prior to forwarding the protest to Appeals."  Exh. 2, Dkt. 1-1 at 73.

5        StenTam has submitted over one hundred administrative "appeals" following IRS

6    summary denials. *Id.* ¶237.  The IRS pushed those appeals into an examination in lieu of

7    the IRS's Independent Office of Appeals. *Id.*  Without relief from the Court, taxpayers are

8    likely faced with a difficult choice between an administrative appeal or judicial review when

9    they should have the right to both.

10   **III.    LEGAL STANDARDS**

11       "A party seeking injunctive relief must show that: (1) it is likely to succeed on the

12   merits; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the

13   balance of equities tips in its favor; and (4) an injunction is in the public interest." *StenTam*,

14   2024 WL 3595643, at *2 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

15   (2008)).  The last two factors merge when the government is a party. *Id.*  Courts "weigh

16   these factors on a sliding scale, such that where there are only 'serious questions going to

17   the merits'—that is, less than a 'likelihood of success' on the merits—a preliminary

18   injunction may still issue so long as the balance of hardships tips sharply in the plaintiff's

19   favor' and the other two factors are satisfied." *StenTam*, 2024 WL 3595643, *2 (quoting

20   *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018)).

21       Plaintiffs support this Motion through a Verified Complaint.  *See* Dkt. 1 at 67-77.  A

22   "verified complaint … may afford the basis for a preliminary injunction." *Perlot v. Green*,

23   609 F. Supp. 3d 1106, 1116 (D. Idaho 2022)  (collecting authorities).  It "may be treated as

24   an affidavit, and, as such, it is evidence that may support injunctive relief." *Beltran Carrero*

25   *v. Barr*, No. 20-CV-05522-DMR, 2021 WL 1164768, at *4 (N.D. Cal. Mar. 26, 2021)

26   (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)).

27

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

## IV.    **ARGUMENT**

The IRS violates the APA, the Due Process Clause, and the Taxpayer Bill of Rights through processing methods that yield arbitrary denials of employer ERC claims, and by hijacking taxpayer appellate rights. The government may not violate law to enforce the law, and administrative convenience will not excuse policies that contravene taxpayer rights. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2458 (2024) ("Pleas of administrative inconvenience … never justify departing from the statute's clear text"); *Patlex Corp. v. Mossinghoff*, 771 F.2d 480, 483 (Fed. Cir. 1985) ("administrative convenience or even necessity cannot override the constitutional requirements of due process.").

### A.    **Plaintiffs Have a Strong Likelihood of Success on the Merits**

Plaintiffs must present at least serious questions of law along with a "fair chance of success on the merits." *See Best W. Int'l, Inc. v. Patel*, 523 F. Supp. 2d 979, 983 (D. Ariz. 2007). Here Plaintiffs challenge IRS action under the APA (5 U.S.C. § 706) and the Due Process Clause. The IRS created processing rules based on arbitrary and capricious criteria lacking factual foundation. When taxpayers appeal decisions based on those improper criteria, the IRS diverts those appeals into IRS examinations instead of an administrative appeal. That scheme violates the APA, the Taxpayer Bill of Rights, and the Due Process Clause.

#### 1.    **IRS Processing Methods Are Arbitrary, Capricious, and Conflict with Agency Policy**

The IRS is issuing summary 105-C denials without factual foundation because it failed to collect sufficient information from taxpayers to determine eligibility. *Id.* ¶¶134-146. The IRS designed "filters" that drive 105-C denials based on arbitrary criteria not specified in the ERC statutes. Thousands of taxpayers have been disallowed ERC, and thousands more will imminently receive similar decisions. Although the IRS uses these processing rules to disallow taxpayer claims, the agency also refuses to divulge details on those standards. Because these processing methods are factually unsupported and arbitrary, the IRS violates the APA through this methodology.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

"The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n. v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).  An agency must consider relevant issues and reasonably explain their decisions. *Id.; Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 30 (1983) (agency action is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.").

"The APA ensures that agencies engage in 'reasoned decisionmaking' and that their decisions evince a 'rational connection between the facts found and the choice made.'" *Cayuga Nation v. United States*, 594 F. Supp. 3d 64, 71–72 (D.D.C. 2022) (quoting *State Farm*, 463 U.S. at 43).  When the "record belies the agency's conclusion, the court must undo its action." *Cayuga Nation*, 594 F. Supp. 3d at 71-72. IRS violates the APA if the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.  "Simply put, the agency must explain why it decided to act as it did, and the reason for the agency's decision must be both rational and consistent with the authority delegated to it by Congress." *Cayuga Nation*, 594 F. Supp. 3d at 72 (internal quotes omitted).

The reasonableness of agency action is measured by the agency's explanations within the record.  Post hac rationalization is not relevant because an agency must defend its actions based on the reasons given when it acted.  *See In re Vestavia Hills, Ltd*, 630 B.R. 816, 843 (S.D. Cal. 2021) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020)).  An agency may not offer a new explanation during litigation but must be judged on the rationale and record that led to the decision.  *See Ctr. for Biological Diversity v. Haaland*, 530 F. Supp. 3d 853, 857 (D. Ariz. 2021).  The Court's inquiry into the agency's basis for action and the factual support "should be 'searching and careful.'" *Id.* (quoting *Califano v. Sanders*, 430 U.S. 99 (1977)).  Here IRS violates the APA through unsupported processing rules and unexplained changes to policy.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

### a)   Processing Rules that Lack Record Support

IRS violates the APA (5 U.S.C. § 706(2)(A)) by creating processing rules that calculate ERC eligibility without an adequate record.  The agency is tasked with individually assessing taxpayer refund claims.  *See Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 691 (N.D. Cal. 2020) ("It is incumbent on the IRS … to make individual determinations whether an individual is an 'eligible individual' and meets the various criteria delineated in the Act").  The IRS cannot individually adjudicate a taxpayer's refund claim using broad processing rules that fail to evaluate each taxpayer's business.

First, IRS lacks information on employer gross receipts per fiscal quarter.  *Id.* ¶¶143, 149, 152. The agency is either choosing to evaluate ERC eligibility by reference to *annual* income, or making decisions without any basis at all.  The ERC statute requires an analysis of gross receipts by calendar quarters for 2020 and 2021 in comparison with receipts earned in 2019.[11]  That analysis grows more complex if an employer claims ERC under the Alternate Quarter Election Rule.  Dkt. 1 ¶68.  The IRS simply cannot determine from a Form 941-X alone whether the employer suffered gross receipt declines by *quarter*, or whether that employer is using alternate quarters to qualify.  *Id.* ¶¶143, 149, 152.  If the IRS is indeed using annual income data to evaluate potential gross receipt declines for fiscal quarters, that process also violates the APA.  Annual income says nothing of a businesses' performance quarter-by-quarter, so the IRS can only speculate on gross receipt declines under the ERC statute.  *Id.* ¶¶149-158.

Second, the IRS also determined, without an adequate factual basis, that no governmental orders were in effect for certain calendar quarters.  The IRS denied ERC claims for 2021-Q3 on that basis, having determined that no applicable orders were "in effect" during that quarter.  *See* Dkt. 1 ¶¶123-130, 175-193.  IRS lacks any foundation for that rule.  Full or partial suspensions under the statute cannot be evaluated in gross, but must factor the unique circumstances of each business, and employers are entitled to an individualized decision for each quarter.  Businesses may have felt the effects of government orders directly or indirectly.  The IRS Notice 2021-20 provides ERC eligibility for certain

---

[11] *See* Section 2301 of the CARES Act, as amended I.R.C. §3134(c)(2)(A)(ii)(II).

1    indirect effects on a business, including supply chain shortages. *See* Exh. 8, Dkt. 1-1 at 144-
2    146.  The Form 941-X did not require disclosure of the specific government orders
3    impacting taxpayers, so IRS has no inputs on how taxpayers were impacted unless it seeks
4    that information from employers.  Defendants have been unable to produce any analysis of
5    government orders nationwide that would support broad conclusions regarding the absence
6    of government orders generally. *See* Dkt. ¶¶108-112, 128-131; *id.* ¶¶72-79.

7        The IRS could have used its "filters" or "analytics" to triage ERC claims for
8    examination.  But when the IRS chooses to make final eligibility decisions based on those
9    flawed rules, the agency violates the APA.  The IRS promised the district court that it would
10   individually review employer claims for ERC.  Dkt. 1 ¶¶87, 98-99.  The IRS has a statutory
11   obligation to perform that review. *Scholl*, 494 F. Supp. 3d at 691.  The IRS has not lived up
12   to those promises by engineering automated decisions using flawed processing rules.

13                    **b)    IRS Changes Procedure Without Notice**

14       IRS summary denials indicate that the agency no longer deems a Form 941-X
15   sufficient to claim ERC.  That change conflicts with instructions IRS gave taxpayers when
16   applying for the credit.  The IRS specified the form for seeking ERC. *Id.* ¶¶134-136.
17   Employers followed those instructions and filed amended returns using the Form 941-X,
18   and IRS initially processed over 3.6 million ERC claims based on information supplied in
19   those forms.  Now the IRS at least impliedly considers that information inadequate to the
20   claim the credit under its new processing rules. The IRS never notified taxpayers with
21   pending ERC claims of this change, or that it required more information to support ERC
22   refunds at the application stage.

23       An unannounced change in policy generally violates the APA, particularly when the
24   change results in arbitrary decision-making. *See, e.g.*, *Farm Sanctuary v. United States*
25   *Dep't of Agric.*, 664 F. Supp. 3d 334, 364 (W.D.N.Y. 2023); *Encino Motorcars, LLC v.*
26   *Navarro*, 579 U.S. 211, 221 (2016).  "[A]n agency must also be cognizant that longstanding
27   policies may have engendered serious reliance interests that must be taken into account."
28   *Encino Motorcars*, 579 U.S. at 221-222.  "It follows that an unexplained inconsistency in

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1   agency policy is a reason for holding an interpretation to be an arbitrary and capricious

2   change from agency practice." *Id.* (quoting *Nat'l Cable & Telecommunications Ass'n v.*

3   *Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

4          The agency's evolving policy conflicts with the principle of tax self-assessment,

5   which presumes taxpayers have accurately calculated their tax liabilities in sworn tax

6   submissions.  *See* 26 C.F.R. § 601.103(a).  "The Federal tax system is basically one of self-

7   assessment" where each taxpayer "is required to file a prescribed form of return which

8   shows the facts upon which tax liability may be determined and assessed[.]"  *Id.*  If the IRS

9   now determines, expressly or impliedly, that its "prescribed form of return" is inadequate to

10  support the ERC claim on its face, the IRS has failed its statutory obligation and betrayed

11  taxpayers who filed for ERC using those systems.

12              **2.    The IRS Violates Taxpayer Due Process and Statutory Rights**

13         Taxpayers claiming the ERC have a protected property interest in funds overpaid into

14  the Treasury pending a refund.  *See, e.g.*, *McKesson Corp. v. Div. of Alcoholic Beverages &*

15  *Tobacco, Dep't of Bus. Regul. of Fla.*, 496 U.S. 18, 51 (1990) (applying federal due process

16  principles to the State's procedures for tax moneys); *In re Martin*, 167 B.R. 609, 613 (Bankr.

17  D. Or. 1994) (Taxpayers had property interest in federal income tax refund).  "Substantive

18  due process protects individuals from arbitrary deprivation of their liberty by government."

19  *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013).  The Court

20  can find a due process violation where agency action strips protected property interests while

21  offending notions of fair play and decency.  "Where … the circumstances afford[ed]

22  reasonable time for deliberation before acting, [courts] consider conduct to be conscience-

23  shocking if it was taken with deliberate indifference toward a plaintiff's constitutional

24  rights."  *Id.*

25         Defendants' latest effort to narrow the ERC program deprives taxpayers of protected

26  interests by arbitrarily denying ERC refunds through knowingly deficient processing rules;

27  altering the application criteria for ERC submissions *post hac*; and changing appellate

28  procedures to the detriment of taxpayers.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

### a)    IRS Knew That It Lacked Information on Taxpayer Eligibility

As noted above, IRS uses software to make ERC eligibility decisions without a sufficient factual basis.  The IRS knew that it lacked data to make those assessments.  In September 2024, the TIGTA acknowledged that "IRS does not have all the data it needs to verify eligibility" and that "the only way the IRS could determine if an employer met these eligibility criteria would be through a resource-intensive examination[.]"  Dkt. 1 ¶143.  Those statements mirrored the IRS's own concessions that it lacked enough data to make these same decisions.  *Id.* ¶¶114-116.  The IRS had actual knowledge that disallowing ERC claims in this way would be inappropriate but chose to proceed despite knowing those 105-C denials could not be supported.  This is deliberate indifference to taxpayer rights that supports Plaintiffs' Due Process claim.

### b)    IRS Never Requested the Necessary Information

The IRS is penalizing taxpayers for failing to supply information that IRS never requested in the ERC application.  IRS instructed employers to claim ERC through a Form 941 or 941-X (amended return), but then told taxpayers to withhold documentation bearing on eligibility: "Don't send these statements to the IRS.  Keep them for your records."  Dkt. 1 ¶137.  Yet IRS is now denying ERC claims because it lacks the very information that IRS asked taxpayers not to submit.  IRS never facilitated an application process that would accommodate more detailed submissions.  *See Swierkowski v. United States*, 620 F. Supp. 149, 151 (E.D. Cal. 1985), *aff'd,* 800 F.2d 1145 (9th Cir. 1986) (finding no due process violation only because, unlike here, the IRS provided notice and "gave [plaintiffs] an opportunity to submit information to support their claims").  By now denying ERC claims because of these agency-created deficiencies, the IRS is penalizing taxpayers for its own shortcomings, another position that reflects a deliberate indifference to taxpayer rights.

### c)    IRS Improperly Diverts Administrative Appeals

The IRS is hijacking taxpayer administrative rights by diverting appeals to revenue agents for examination rather than into the IRS Office of Independent Appeal.  *See* Dkt. 1 ¶¶207-217.  Those measures prevent taxpayers from completing administrative appeals within the two-year statutory window.  Taxpayers cannot meet that two-year deadline where

IRS chooses to examine their ERC claims only after first starting the statutory clock through a 105-C disallowance.  *See* Dkt. 1 ¶¶219-224.  If an employer cannot complete that administrative appeal within two years after disallowance, it loses the ability to collect from the IRS outside a civil refund suit under I.R.C. §§ 6532(a):

> Not only does the taxpayer only have two years to file suit, but the IRS cannot issue the taxpayer a refund beyond this two-year period.  In other words, if the taxpayer goes to Appeals, and Appeals agrees with the taxpayer but the two-year period has expired, the IRS cannot issue a refund because any such refund would be considered erroneous.

*See* Exh. 2, Dkt. 1-1 at 73 (TAS Press Release).  Because the IRS cannot close both an examination and appeal before the two-year period lapses, IRS's change in procedure forces taxpayers to choose between their ERC refunds or an expensive civil refund suit.  *See* Dkt. 1 ¶¶219-224.  Small businesses with legitimate ERC claims should not be forced to lose appellate rights or incur the costs of civil litigation all because the IRS was unwilling to provide an individualized review beforehand.

That reflects a violation of IRS's obligation to provide a meaningful administrative pathway before requiring taxpayers to engage in litigation.  The Taxpayer Bill of Rights (I.R.C. § 7803(a)(3)) ("TBOR") statutorily guarantees the rights to pay no more than the correct amount of tax, to challenge IRS positions, to a fair and just tax system, and to a prompt administrative appeal in an independent forum.  *See* I.R.C. § 7803(a)(3).  The TBOR guarantees the "right to appeal a decision of the Internal Revenue Service in an independent forum[.]" I.R.C. § 7803(a)(3)(E); Dkt. 1 ¶214.  Defendants abridge those rights by delaying the post-disallowance process to a point where IRS cannot complete administrative appeals within the time set by Congress.  IRS violates due process by acting with deliberate disregard for taxpayer appellate rights in that context.

### d) Disparate Treatment of Taxpayer Claims Without Explanation

The IRS's shifting methodology results in disparate treatment of taxpayers with similar circumstances.  *Id.* ¶¶205 n.28, 229, 232-236.  The IRS's eligibility "filters" impose undefined and unexplained standards that were not imposed on other taxpayers before May

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

2024. The IRS is therefore setting different standards for taxpayers that are now subject to the Disallowance During Processing protocol.

"There is no dispute that, as a general matter, similarly situated taxpayers should not be treated differently." *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 797 (6th Cir. 2005); *Oshkosh Truck Corp. v. United States*, 123 F.3d 1477, 1481 (Fed. Cir. 1997) ("The Service's position … is inconsistent with the frequently expressed view that, unless there is a rational reason for different treatment, similarly situated taxpayers should be treated similarly") (collecting cases).

The IRS is denying taxpayer ERC claims when other employers having nearly identical circumstances were earlier granted the credit. *See* Dkt. 1 ¶¶227-236. The only material change in circumstance is the date when IRS processed these ERC claims. The record includes comparisons of ERC submissions that IRS approved and paid before the 2023 moratorium, compared with claims that IRS recently disallowed on nearly the same information. *Id.* ¶¶232-236. Those examples include 105-C summary denials that IRS issued to ERC claimants with same type of business, in the same geographic regions, and for the same tax quarters as employers that earlier received ERC from IRS before the moratorium. *Id.*

IRS had ample opportunity to review individual taxpayer claims during its processing moratorium that spanned nearly one calendar year. It told the Court that the moratorium was designed for that purpose. *Id.* ¶87. Despite those promises, the IRS devised a system that instead exploited IRS's information deficit to the detriment of taxpayer rights. In sum, these administrative actions collectively offend notions of fair play and decency. Defendants have acted with a deliberate indifference toward taxpayer constitutional rights. *See Sylvia*, 729 F.3d at 1195-96 (evaluating whether the government program "was arbitrarily and unreasonably applied to any of the plaintiffs").

### e)    The IRS is Prejudicing Taxpayers to Avoid Defaulting on Its Obligation to Assess Taxes Within Three Years

Under I.R.C. § 6501(a), the IRS has a three-year statute of limitations to assess taxes. The IRS is likely motivated by the need to avoid that looming three-year statute of

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

limitations.  That period is measured from the date the original tax return is filed with the IRS.  *See Chaney v. United States*, 45 Fed. Cl. 309, 316 (1999); *see also Bufferd v. Comm'r*, 506 U.S. 523, 533 (1993) (holding that the limitations period for assessing tax liability runs from the filing date of the original individual return).  The measuring date for employment tax returns is "April 15 of the succeeding calendar year[.]"  *See* I.R.C. § 6501(b)(2).  Therefore, relevant to ERC, the IRS's three-year period for tax assessment expires on April 15, 2025, for all 2021 ERC quarters.

Under the code, if the IRS does not "assess" taxes under the ERC program by April 15, 2025, the agency is barred unless it asks taxpayers to extend the statutory period against their own interest.  Because the IRS made almost no progress on ERC claims during its self-imposed moratorium, the agency now has insufficient time to complete examinations before the April 15, 2025 cutoff.

When it announced the moratorium in September 2023, the IRS had 880k ERC claims pending.  *See id*.  In related litigation, the district court concluded that IRS "theoretically could have processed 1.73 million ERC claims over the course of 10 months" during the moratorium.  *See StenTam*, 2024 WL 3595643, at *13.  That would have eliminated the pending ERC backlog.  But by taking no action, the IRS imperiled its ability to assess tax on pending ERC claims unless, of course, it can rapidly deny those claims before the looming April 15th deadline.

The IRS's solution is to deny large tranches of pending ERC claims using purported "filters" in lieu of individualized reviews.  Defendants developed that system knowing they lacked a factual basis to make informed decisions on ERC eligibility.[12]  This is unconscionable conduct taken with deliberate indifference to taxpayer rights that elevates bureaucratic convenience over taxpayer interests, and supports a Due Process violation.

**B.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief**

"A plaintiff seeking preliminary relief must demonstrate that irreparable injury is

---

[12]  IRS still advised staff to gather data on the amount of "dollars saved" through these summary denials, presumably so the agency can continue touting the volume of purportedly "ineligible" claims within the program.  Dkt. 1 ¶119 n.18.

likely in the absence of an injunction." *StenTam*, 2024 WL 3595643, at *15. "The analysis focuses on the irreparability of the injury rather than its 'magnitude.'" *Los Altos Boots v. Bonta*, 562 F. Supp. 3d 1036, 1046 (E.D. Cal. 2021). "The temporary loss of use of one's money constitutes an injury in fact for purposes of Article III." *StenTam*, 2024 WL 3595643, at *3 (quoting *Van v. LLR, Inc.*, 962 F.3d 1160, 1164 (9th Cir. 2020)). "[T]he general rule that economic harm is not normally considered irreparable does not apply where there is no adequate remedy to recover those damages, such as in APA cases." *Id.* (quoting *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)). "[W]here parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases— economic harm can be considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

### 1.    Irreparable Financial Harm

StenTam and ERC Today offer tax preparation services for clients seeking ERC refunds. Dkt. 1 ¶¶23-25, 30-32. Both outfits are paid on contingency out of ERC refunds received by their clients. *Id.* ¶¶24-27, 36. If a client suffers a delay in payment, or has an ERC claim denied, Plaintiffs are then also denied payment for their services. *Id.* StenTam is also contractually obligated to help clients resolve post-denial administrative proceedings at no extra cost to its clients. *Id.* ¶¶28, 251, 279. Both plaintiffs are therefore required to invest additional resources addressing IRS 105-C disallowances, particularly given the likelihood that clients will now be forced into refund litigation over those submissions. *Id.* ¶¶27, 250-252.

Here, as in *StenTam*, "there is no mechanism for Plaintiffs to seek damages from Defendants' actions as the APA only allows for injunctive relief." *Id.* Plaintiffs do not sue for money damages, and they lack standing to pursue refund claims under I.R.C. §§ 6532(a) and 7422(a). *See, e.g.*, *Jewell v. United States*, 548 F.3d 1168, 1172 (8th Cir. 2008) ("standing to sue for a tax refund extends only to the taxpayer from whom the tax was allegedly wrongfully collected"). Any ensuing financial loss to Plaintiffs caused by the IRS's unlawful processing scheme between now and the conclusion of this case will be

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1  irreparable.

2          **2.      Reputational Harm**

3          "Injuries to goodwill and business reputation are generally considered to be

4  intangible and, as a result, irreparable." *Am. Promotional Events, Inc.--Nw. v. City & Cnty.*

5  *of Honolulu*, 796 F. Supp. 2d 1261, 1283 (D. Haw. 2011); *see also Xport Forwarding LLC*

6  *v. Mesitis DWC LLC*, 694 F. Supp. 3d 1258, 1270 (C.D. Cal. 2023) ("The Ninth Circuit

7  recognizes that loss of reputation and goodwill can constitute irreparable harm").  The IRS's

8  summary disallowances cause significant and irreparable reputational harm.  StenTam's and

9  ERC Today's clients retained Plaintiffs because of their expertise in ERC processing.  Dkt.

10  1 ¶¶23-24, 30-31, 255.   When the IRS summarily disallows an ERC claim without

11  examination and without requesting additional information, the IRS indicates that the ERC

12  paperwork was facially inadequate to claim the credit.  Those summary denials therefore

13  erode client confidence in StenTam's services and create obvious doubt in the legitimacy of

14  those ERC claims.  *Id.* ¶¶255-256.

15          An IRS "disallowance" carries a significant stigma.  Clients unsophisticated with

16  ERC practice will not appreciate that IRS summary denials are flawed and factually

17  unsupported.  Dkt. 1 ¶¶255-256.  The IRS 105-C letters falsely and misleadingly state that

18  the agency denied claims based on "records" affirmatively proving ineligibility.  *See, e.g.*,

19  Dkt. 1 ¶102 ("Based on a review of IRS records, we have determined you are not an Eligible

20  Employer for purposes of the Employee Retention Credit[.]").  Those decisions increase the

21  likelihood that Plaintiffs' clients will forgo further proceedings to vindicate otherwise

22  eligible ERC claims.  *Id.* ¶256.  StenTam has already needed to dedicate substantial time

23  into rehabilitating client relationships.  *Id*.  Those irreparable injuries will be repeated unless

24  the Court enjoins the IRS's unlawful processing tactics.  *Id.* ¶¶256-257.

25          **3.      Irreparable Constitutional Injury**

26          Plaintiffs have a likelihood of success on Due Process claims alleging injury from

27  the IRS's arbitrary decisions, deprivation of statutory rights, and procedural infirmities.  *See*

28  *supra* Part IV.A.2.   "It is well established that the deprivation of constitutional rights

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

unquestionably constitutes irreparable injury." *Doe v. U.S. Dep't of Just.*, 650 F. Supp. 3d 957, 1012 (C.D. Cal. 2023) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005)).

Here Plaintiffs assert a constitutional injury on behalf of themselves and their clients. Plaintiffs have a constitutional injury to property rights in the form of payments denied by IRS decisions. Plaintiffs have contractual relationships with their clients under which they share the same qualitative interest in ERC refunds as those employers. *See* Dkt. 1¶¶28, 251, 279. Plaintiffs therefore have independent constitutional injuries.

Plaintiffs also have standing to litigate their clients' constitutional injuries because those clients are hindered from challenging IRS constitutional violations independently. "[O]ne seeking to satisfy the hindrance requirement for third party standing need only demonstrate that there is some impediment to the real party in interest's ability to assert his own legal rights," and the Supreme Court recognizes that a third party's financial disincentive to litigate is a sufficient hindrance justifying third party standing. *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010); *see also Moody v. Michigan Gaming Control Bd.*, 847 F.3d 399, 402–03 (6th Cir. 2017) (the small financial stake and cost of litigation preclude parties in interest from raising constitutional claims and therefore allow for third-party standing). Most of these ERC claims are low in value. Clients were summarily denied claims often valued at less than $30,000. *Id.* ¶¶280-281. Each ERC amount in controversy is often substantially less than the costs of a civil refund action or a lawsuit to enjoin constitutional violations. *Id*. Plaintiffs' clients cannot justify the costs to litigate constitutional concerns when the ERC amount in controversy is substantially less than the costs of litigation. *Id.* ¶¶280-281.

Plaintiffs are also uniquely positioned to litigate these issues here. *Id.* ¶282. They each have multiple clients subjected to the IRS's improper policies. *Id.* They have financial interests in each of those client files. Plaintiffs can provide the Court with a more developed

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

record on the IRS's unlawful conduct than individual clients could advance independently. Plaintiffs' clients would otherwise lack the resources to fully investigate and identify the unconstitutional conduct.

Without preliminary injunctive relief, the IRS threatens imminent constitutional injury. In October 2024, the IRS announced plans to process another 400,000 ERC claims using the same flawed systems here at issue. Dkt. 1 ¶239. IRS signaled its intent to continue use of its improper processing rules. *Id.* ¶¶239-240. As IRS continues to deny claims through its "Disallowance During Processing" campaign, Plaintiffs will incur financial, reputational, and constitutional injuries that cannot be remedied through a judgment at the close of litigation.

## C.    The Balance of the Equities Favors an Injunction

When the government is a party, the final two factors in the preliminary injunction analysis merge. *See StenTam*, 2024 WL 3595643, at *16 (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)). The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. The court must also "address impact on non-parties rather than the parties." *StenTam*, 2024 WL 3595643, at *16 (quoting *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014)).

"When the alleged action by the government violates federal law, the public interest factor usually weighs in favor of the plaintiff." *StenTam*, 2024 WL 3595643, at *16. The IRS has no legitimate interest in acting unlawfully. *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 546 (D.D.C. 2020) ("[t]here is no public interest in the perpetuation of an unlawful agency action"); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 11 (D.C. Cir. 2016). "Rather, the public interest is harmed when the government hamhandedly exercises its responsibilities." *P.J.E.S.*, 502 F. Supp. 3d at 546. "[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Defendants violate the APA through their improper ERC processing tactics. Those violations imperil property rights of tens of thousands of taxpayers. "The public interest is served by compliance with the APA." *E. Bay Sanctuary*, 993 F.3d at 678. Impacted taxpayers have an interest in the fair and just administration of their tax claims. A preliminary injunction preserves taxpayer rights, while imposing no burden on the IRS.

This case is also inherently time sensitive. The IRS's processing scheme will prevent completion of taxpayer appeals at the agency level. Dkt. 1 ¶¶207-225. If relief comes only at the close of this case, many taxpayers will have lost a substantial portion of their two-year appellate window. That timeline cannot be later reversed or extended by this Court.

A preliminary injunction also forestalls "bureaucratic momentum" created when an agency adopts policy that becomes increasingly difficult to rollback once implemented. *See Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989); *Protecting Arizona's Res. & Child. v. Fed. Highway Admin.*, No. CV-15-00893, 2015 WL 12618411, at *5 (D. Ariz. July 28, 2015) (discussing irreparable harm in the form of "bureaucratic momentum"). Defendants' unlawful policies cause thousands of procedurally deficient denials. Employers must make significant strategy decisions based on the 105-C disallowance, including whether to file a refund suit or pursue an administrative appeal. Taxpayers will face difficulties in overturning IRS administrative decisions where the agency has an incentive to justify its earlier denials. *See Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) ("This case raises a concern over BLM's ability to fulfill its procedural obligations without favoring a predetermined outcome"). "Bureaucratic rationalization and bureaucratic momentum are real dangers[.]" *Id.* (quoting *N. Cheyenne v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988)). Once the IRS has committed to a course that involves the mass denial of hundreds of thousands of ERC claims, the likelihood that IRS can manageably reverse course grows less over time.[13]

The IRS's competing interest is one of convenience. But mere bureaucratic

---

[13] Though "bureaucratic momentum" is often evaluated in environmental cases, the rationale extends to administrative programs in other contexts. *See, e.g., Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1221 (D. Colo. 2007) ("Once large bureaucracies are committed to a course of action, it is difficult to change that course").

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

expediency does not tip the balance of harms.  While the IRS may find it advantageous to purge hundreds of thousands of pending ERC claims through unlawful proceedings, that expediency is not a sufficient basis to deny Plaintiffs relief.  *See Texas v. United States*, 524 F. Supp. 3d 598, 664 (S.D. Tex. 2021) (An agency's "resource intensive duties and responsibilities do not grant license to suspend the law").

The public interest and balance of equities tip sharply in Plaintiffs' favor.  Without relief, Plaintiffs and their taxpayer clients will incur significant and irreparable injuries.  Taxpayers will lose procedural and substantive rights.   The IRS also suffers no commensurate harm by processing ERC claims under the agency's conventional procedures.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs seek an Order under Fed. R. Civ. P. 65(a) halting unlawful summary denials, restoring the established procedures for review of these claims, vacating all denials issued through improper IRS filters, and requiring IRS to provide taxpayers proper notice and prompt access to an independent administrative appellate process.  Under Local Rule 7.1(b)(2), a proposed order is hereby attached.

DATED:  January 7, 2025.

Respectfully submitted,

By:    */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq. (SBN 025346)
GREENBERG TRAURIG, LLP
Em:  peter.arhangelsky@gtlaw.com
*Attorney for Plaintiffs Stenson Tamaddon, LLC, and ERC Today, LLC*