DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON
MOIRA E. GOODWIN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
202-307-6422 (phone)
202-514-6866 (fax)
amy.t.matchison@usdoj.gov
moira.e.goodwin@usdoj.gov
western.taxcivil@usdoj.gov

*Attorneys for United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Phoenix Division

| | |
|---|---|
| ERC Today, LLC, *et al.*, | Case No. 2:24-cv-3178-SMM |
| Plaintiffs, | Judge Stephen M. McNamee |
| v. | **DECLARATION OF DOUGLAS O'DONNELL** |
| John McInelly, *et al.*, | |
| Defendants. | |

I, Douglas O'Donnell, declare the following, pursuant to 27 U.S.C. § 1746:

1. I am the Deputy Commissioner, who oversees four divisions of the IRS: Taxpayer Services, Tax Compliance, Information Technology and Operations. The four divisions' heads – Chief, Taxpayer Services, Chief Tax Compliance Officer, Chief Information Officer, and Chief Operation Officer – report directly to the Deputy Commissioner, who reports to the Commissioner of the IRS.

1

2. I am making this declaration from briefings I have attended on the employee retention credit (ERC), from discussions with other executives and employees, and from my review of relevant documents and data received.

**Legislative History of the Employee Retention Credit**

3. The Employee Retention Credit (ERC) has had a complicated history. It was enacted March 27, 2020, under section 2301 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020) to encourage employers who were adversely impacted by the COVID-19 pandemic to keep employees on their payroll.

4. When it was enacted by the CARES Act, the ERC was a refundable credit against applicable employment taxes of an eligible employer in an amount equal to 50% of the qualified wages (not to exceed $10,000) with respect to each employee for all calendar quarters in 2020.

5. Under the CARES Act, as originally enacted, an *eligible employer* is one that was carrying on a trade or business during the 2020 calendar year and, with respect to the calendar quarter in which the employer is claiming the credit, either (1) the trade or business was fully or partially suspended due to a government order limiting commerce, travel or group meetings due to the COVID-19 pandemic, or (2) the calendar quarter was within the period beginning with the first calendar quarter after December 31, 2019, in which the employer experienced a more than 50% reduction in gross receipts compared to the same calendar quarter in 2019 and, ending with the calendar quarter following the first calendar quarter after the one previously described in which the employer sustained less

than a 20% reduction in gross receipts from the same calendar quarter in 2019 (gross receipts test).  Tax-exempt organizations are treated as carrying on a trade or business for purposes of the ERC.

6. Under the CARES Act, as originally enacted, for eligible employers with more than 100 full-time employees, the term *qualified wages* meant wages paid to employees who did not provide services due to the trade or business being suspended or due to a reduction in gross receipts.  For other employers, all wages were considered qualified wages.

7. Under the CARES Act, as originally enacted, the ERC applied to eligible wages paid after March 12, 2020, and before January 1, 2021.  Some of the restrictions included: (1) the ERC was not available to governmental employers, (2) it was not available for employers who received a Paycheck Protection Program (PPP) loan, (3) certain employees could not be taken into account for purposes of the ERC, and (4) an employer could not use the wages taken into account for ERC to determine certain other credits.

8. Nine months after the ERC was enacted, on December 27, 2020, the CARES Act was amended and modified by the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act), enacted as Division EE of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020).  Section 206 of the Relief Act adopted *retroactive* amendments and technical changes for qualified wages paid after March 12, 2020, and before January 1, 2021.  The changes included but were not limited to: (1) removing the categorical restriction on employers who received a PPP loan from claiming the credit; (2) adding a restriction related to the ERC for employers

affected by qualified disasters under section 303(d) of the Relief Act; and (3) providing that gross receipts for a tax-exempt employer are determined using the definition under section 6033 of the Internal Revenue Code (Code).

9. Section 207 of the Relief Act, effective for calendar quarters beginning after December 31, 2020, made additional changes to the ERC that applied *prospectively*. Those changes included: (1) making the ERC available for eligible employers paying qualified wages that are paid after December 31, 2020, and before July 1, 2021; (2) increasing the maximum credit amount that may be claimed per employee to 70% (up from 50%) of $10,000 of qualified wages paid to an employee per calendar quarter; (3) allowing certain governmental employers to claim the credit; (4) modifying the gross receipts test; (5) modifying the definition of qualified wages; (6) broadening the denial of double benefit rule and applied it to certain sections of the Code; and (7) changing the eligibility to receive advance payments and limited the amount of the advances.

10. On March 11, 2021, the ERC was further extended by the enactment of section 3134 of the Code, which was enacted by section 9651 of the American Rescue Plan Act of 2021 (the ARP), Pub. L. No. 117-2, 135 Stat. 4 (March 11, 2021). Section 3134 of the Code provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022. Section 3134 of the Code generally maintained the structure of the ERC as provided under section 2301 of the CARES Act, and as amended, with certain changes. Among other changes, section 3134 of the Code: (1) made the ERC available for eligible employers that paid qualified wages after

June 30, 2021, and before January 1, 2022; (2) applied the credit against taxes imposed under section 3111(b) of the Code (employer's share of Hospital Insurance (Medicare) tax), or so much of the taxes imposed under section 3221(a) of the Code that are attributable to the rate in effect under section 3111(b) of the Code; (3) expanded the types of eligible employers to include a "recovery startup business" (which is defined in section 3134(c)(5) of the Code); (4) modified the definition of qualified wages for "severely financially distressed employers" (*see* section 3134(c)(3)(C) of the Code); (5) modified the definition of qualified wages to exclude certain wages; (6) provided that the ERC shall not apply to so much of the qualified wages paid by an eligible employer as are taken into account as payroll costs in connection with a covered loan under section 7(a)(37) or 7A of the Small Business Act, a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Non-Profits, and Venues Act, or a restaurant revitalization grant under section 5003 of the ARP Act; and (7) extended the limitation on the time period for assessment from 3 years to 5 years.

   11. Finally, the ERC was terminated for most employers in the fourth calendar quarter of 2021 by the Infrastructure Investment and Jobs Act (IIJA), Pub. L. No. 117-58, 135 Stat. 429 (2021), enacted on November 15, 2021. The IIJA retroactively amended section 3134 of the Code so that only a recovery startup business may claim the ERC in the fourth calendar quarter of 2021.

   12. The legislative history of the ERC that is detailed above spans only a short amount of time but demonstrates how complex the ERC is. Having the IRS process a refundable credit with advances in the employment tax area is uncommon.

**Processing Forms 941-X, Risk Assessment Model, ERC Claims Pre-Moratorium**

13. The IRS cannot examine every return or claim for refund that is submitted. The criteria that the IRS uses to determine how to select returns for examination, such as through the discriminant function system (DIF), are not announced publicly in detail, and the criteria change to best allocate the IRS's limited resources to address tax noncompliance. Because of the potential for abuse, the criteria are kept secret, and Congress has protected the criteria from disclosure. *See* I.R.C. § 6103(b)(2) ("Nothing . . . in any other provision of law[] shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining such standards, if the Secretary determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws."). Disclosing too much detail about how returns are selected for examination would allow unscrupulous actors to plan around examination selection without ensuring that a taxpayer's return is accurate.

14. To claim an ERC, a taxpayer generally files Form 941, *Employer's Quarterly Federal Tax Return*, or 941-X, *Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund,* but could also claim the ERC on other forms like a Form 943, *Employer's Annual Federal Tax Return for Agricultural Employees*, or Form 944, *Employer's Annual Tax Return*. The Form 941 can be filed electronically. However, before 2024, Form 941-X could only be filed *on paper*.

15. When the ERC was enacted, the IRS issued initial guidance to taxpayers as quickly as possible, and updated the existing Forms 941 and 941-X. The IRS chose to adapt existing Forms 941 and 941-X—the forms already used to

6

report employment taxes—because the ERC is a credit against employment taxes. Developing new forms or schedules, particularly if they were issued before guidance was provided, could have delayed the ability of businesses to accurately and timely claim the ERC.  The IRS also developed Form 7200 to process advances of the credit, which would be reconciled on the updated Form 941.

16. Due to the timing of the legislation, many employers were required to file Forms 941-X on paper to claim the ERC because they had already filed their Forms 941 for the relevant quarter(s).  The electronic-filed nature of the Form 941 versus the paper-filed nature of the 941-X complicates the IRS's processing.

17. The procedures to accurately process and examine ERC claims are complex.  Processing here refers to recording adjustments made based on ERC claims, paying out approved claims, minimizing payment of inappropriate or excessive claims, and reporting on the status and progress of ERC processing.

18. Whereas electronic filing allows for items on the return to be automatically input into a taxpayer's account on IRS systems, an IRS employee must manually input certain data from the Form 941-X into a taxpayer's account on IRS systems (data capture or transcription).  Before any case selection criteria can be applied or risk analysis performed, Forms 941-X must first be manually transcribed.  This can be an extremely time-consuming process, particularly if the volume of returns to be transcribed is high.

19. Prior to 2021 and during part of 2021, the IRS would determine which Forms 941-X would be subject to further review using a selection model that, in the IRS's experience, works well when low volumes of returns are expected and significant abuse is not present.  The selection model used minimal, simple criteria.  If a Form 941-X

7

was filtered for further review after applying the exam selection criteria, a classifier would then manually review the Form 941-X to determine whether it should be selected for a full examination. Classifiers apply their own criteria to determine whether a return is referred for examination.

20. The IRS has issued a significant amount of guidance on the ERC, both formal published guidance and informal guidance published on irs.gov (including extensive frequently asked questions and press releases). From 2020 through 2023, the IRS participated in over 400 events where ERC was a focus, including several panels at recent Nationwide Tax Forums. The goal of these efforts was to properly educate taxpayers and practitioners on the requirements to claim the ERC.

21. Prior to 2021, the volume of Forms 941-X received averaged less than 100 per month. In 2021, the volume of Forms 941-X increased swiftly and significantly. By March 2021, the monthly volume had increased by 8,000-10,000%. This increase could be due in part to the retroactive changes made by the Relief Act. The IRS also continued to hear from practitioners and taxpayers that fraud was prevalent in ERC claims.

22. Unscrupulous promoters have marketed the ERC by providing bad or misleading advice or encouraging businesses to claim the credit regardless of eligibility.

23. For example, some entities were sending letters that look very similar to IRS notices to taxpayers promising a particular ERC amount in exchange for engaging their services, but without having actual knowledge of the

taxpayer's business. Some entities have used online platforms to offer step-by-step instructions on how to complete a Form 941 or Form 941-X to maximize the ERC, also without having actual knowledge of any particular taxpayer's business. Some entities even encouraged taxpayers to create entities that did not exist before March 27, 2020, to claim the ERC. Claims filed due to aggressive and unscrupulous promoters have adversely affected what is already a difficult processing situation for the IRS at a time when taxpayers need assistance.

24. Due to the increased volume of Forms 941-X, the IRS had to make changes to its data capture methods, and to its referral criteria and selection model. The IRS explored using special technology to reduce transcription time by automatically extracting data from scans of the paper forms. After multiple tests attempting to improve the accuracy of the data based on increased resolution and other software tweaks, the method was deemed to not be reliable and was not implemented.

25. The IRS also added additional criteria to use in the selection model. After applying the selection and referral criteria, if a return was selected for review, it was subject to further manual review, which has led to growing numbers of employees performing manual reviews.

26. Regardless of these changes, the IRS was still unable to keep up with the growing volume of claims requiring closer review. By the week ending December 31, 2023, the inventory had grown to more than 1.1 million claims. All of these claims were paper returns, which, as described above, take the IRS significantly more time to process than electronically-filed returns.

27. In light of the aggressive marketing of the ERC, the increasing number of ERC claims submitted to the IRS, and the difficulties in ensuring that valid ERC claims were processed and ineligible claims were not paid out, the IRS announced a moratorium on processing claims submitted after September 14, 2023.

28. One of the goals of the moratorium was to disrupt the burgeoning business model of promoters and preparers submitting ineligible claims. Another goal was to facilitate changes to IRS processing so that the compliant ERC claims could be identified and more quickly processed and paid.

29. In September 2023, the ERC program team was restructured to manage data capture, risk assessment, and processing, all of which are relevant to paying or denying ERC claims.

30. In terms of data capture, by January 4, 2024, there were over 28 times as many employees assigned to transcribing Forms 941-X as compared to November 2022.

31. By January 22, 2024, the data from approximately 541,000 claims had been transcribed.

32. By June 2024, the IRS had transcribed approximately 1 million ERC claims.

33. To date, other than a few outlier situations, the IRS has completed transcribing the backlog of calendar year 2020 and 2021 returns. In addition, the IRS was primarily using software to capture return information.

34. In terms of risk assessment, the IRS has developed a more dynamic risk assessment model that allows the IRS to categorize returns by risk level. The risk assessment model applies entity level filters, looking at information that the taxpayer has provided, and publicly-available information (including state closure orders), to test against criteria to determine ERC eligibility. The risk assessment model predicts the likelihood that a taxpayer's claim is valid or invalid. The full extent of the risk assessment model is not being disclosed because doing so could impede enforcement efforts.

35. Similar to how the IRS risks other returns, the information and formulae used are not disclosed because of the potential that they could be abused by unscrupulous promoters. However, the risk assessment model allows the IRS to group large numbers of returns by risk because the IRS does not and cannot examine each return that is filed. The risk assessment model does not always determine that a taxpayer's claim is definitively valid or invalid. Instead, claims are given a risk score based on the likelihood that certain criteria are met or not met. Some criteria weigh heavier in determining risk than other criteria. The IRS can then determine, based on the risk level which claims can be allowed, disallowed, or held for further review.

36. In a December 6, 2003, press release, the IRS noted that claims falling into two categories were being disallowed (and issued a Letter 105-C, *Disallowance of the Employee Retention Credit*) based on the risk assessment model: (1) the entity was not in existence during the period of eligibility, and/or (2) there were no paid employees during the period of eligibility (i.e., no Forms W-2 on file for past years). *See*

https://perma.cc/S8UJ-J4HX.  This is an example of the IRS immediately disallowing claims based on the risk assessment model.

37.     Those two factors do not represent the entirety of the IRS's risk assessment model but demonstrate that there are situations where disallowing claims grouped in a particular way is warranted based on basic legal requirements needed to be met to qualify for the ERC.

38.     By June 2024, the IRS, using the risk assessment model, determined that 10-20% of the remaining claims in inventory showed the highest amount of risk for being ineligible and issued disallowance letters on these claims. Another 10-20% showed a low risk of being improper, and the IRS began issuing refunds on these claims.  For the remainder, the IRS continued gathering information and refining its criteria to improve its process, expedite resolving valid claims, and protect against making improper payments.

39.     On August 8, 2024, the IRS announced that claim disallowance letters would be issued to 28,000 high risk claims, and that 50,000 of the lowest risk claims would be processed for refund issuances.  The IRS also announced that it would begin work on claims filed between September 14, 2023, and January 31, 2024, focusing on the highest- and lowest-risk claims and using the risk assessment model.

40.     To date, the IRS has issued approximately 100,000 full or partial disallowances for ERC claims in the form of a Letter 105-C or 106-C.

41.     The IRS continues to monitor and reconfigure the risk assessment model as needed.

**Taxpayer Remedies to a Full or Partial Disallowance of Claims; Appeals**

42. The plaintiff incorrectly suggests that the IRS is limiting taxpayers' ability to have their claims heard. Taxpayers who are waiting for administrative resolution of their claim, or who disagree with the IRS's disallowance of the claim have options to ensure that their claims are fully reviewed.

43. Under section 6532 of the Internal Revenue Code, taxpayers waiting for administrative resolution of their refund claim can file a suit for refund once six months have passed from the date the claim for refund was filed (unless the IRS renders a decision on the claim at an earlier date).

44. The plaintiff in this case specifically points to Letter 105-C, which was one way in which the IRS disallowed an ERC claim using the risk assessment model. The Letter 105-C describes the basis for disallowing a claim. Although the specific language used is standardized, there are numerous bases for disallowance. Additionally, because the risk assessment model only predicts eligibility, the disallowance letters only disallow claims. The disallowance letters do not assess additional amounts of tax.

45. Because no additional amounts are assessed or collected by the disallowances, the period of limitations under section 6501 is irrelevant.

46. For claims that have been fully or partially disallowed where a Letter 105-C or 106-C has been issued, taxpayers that disagree with the IRS's disallowance have three options.

47. First, the taxpayer can respond to the letter with additional documentation to support the claim of eligibility and the amount. *See* https://perma.cc/Y59H-Z5SLSecond, if the taxpayer disagrees with the IRS's disallowance, the taxpayer can file

13

a protest to appeal to the IRS Independent Office of Appeals ("Appeals"). Appeals is an office in the IRS that was established to resolve Federal tax controversies without litigation on a basis that is fair and impartial to both the Government and the taxpayer.  In 2019, the Taxpayer First Act of 2019, Public Law 116-25, 133 Stat. 981 (2019), add new section 7803(e)(3) to the Internal Revenue Code, which further codifies Appeals' mission to promote consistent application and interpretation of, and voluntary compliance with, the Federal tax laws.  Section 7803(e)(4) states that the resolution process to resolve Federal tax controversies described in section 7803(e)(3) "shall be generally available to all taxpayers."

48.     Taxpayers can request an appeal when they send additional information in response to the letter.

49.     If a taxpayer requests Appeals consideration, the taxpayer should send the request to the IRS.  The IRS will consider the taxpayer's explanation and documentation before sending the request to Appeals.  This serves two taxpayer-friendly purposes.  First, it allows the IRS to quickly allow the claim if the taxpayer's documentation clearly supports allowing the claim.  Second, because Appeals is not the first finder of fact, any new information would need to be sent back to IRS examination for review anyway, so putting this step first helps reduce the time to reach a decision on the taxpayer's claim.  The process ensures that a taxpayer's explanation and documentation is reviewed faster in hopes of a quicker resolution.

50. To date, of the approximate 100,000 full and partial disallowances that the IRS has issued, the IRS has received replies, some of which request Appeals consideration, from approximately 2,000 taxpayers.

51. The third option for a taxpayer that disagrees with the IRS's disallowance is to file a refund suit in either the district court or Court of Federal Claims. After a claim has been disallowed, an affected taxpayer can file suit within the statute of limitations without needing to wait for any administrative appeal process to conclude. This option is also available if Appeals upholds the IRS's full or partial disallowance of the claim, provided that the suit is filed within the statute of limitations.

**Additional Measures to Promote Compliance and Expedite Claims**

52. By the end of 2023, the IRS also implemented measures to promote public compliance with the law. For example, the IRS started a claim withdrawal process for taxpayers with unprocessed returns to withdraw the full amount of claims to which they no longer believed they were entitled.

53. The IRS also instituted a voluntary disclosure program for taxpayers with processed claims to repay all or a portion of an incorrect ERC.

54. The IRS also began educational knock-and-talk visits with preparers and promoters and began sending pre-refund educational notices to taxpayers. The IRS also increased promoter and preparer investigations.

55. The IRS also recently piloted a streamlined correspondence audit process for ERC claims that were pending from the summer of 2023. The pilot was a success and the IRS hopes to use this process for claim resolution in many cases going forward. This process does not start with the IRS sending a Letter 105-C or 106-C (Claim Partially

Disallowed). Instead, taxpayers will receive an initial contact letter requesting further information regarding the claim. However, the taxpayer's claim is not reviewed through the standard field exam, thereby saving time. If the claim is denied or partially denied, the taxpayer will then receive a Letter 105-C or 106-C, and the taxpayer's remedies as described above apply.

56. The IRS also started engaging more directly with third party payers that represent numerous businesses and perform their payroll processing functions, including paying employment taxes and filing employment tax returns using the third party payer's employer identification number.

57. Specifically, the IRS has asked these third party payers to consolidate the multiple claims that they filed per quarter into a reconciled return for each quarter that represents all of the businesses for which they filed claims. As the IRS receives these returns, they are risked.

58. While the number of claims filed by these third party payers is relatively small, the number of businesses is large. As of November 2024, these claims in the IRS inventory represented approximately $32 billion in refund claims.

59. The IRS also has been engaging with the Taxpayer Advocate Service (TAS) on many claims. As of November 26, 2024, the IRS has worked approximately 10,500 ERC claims out of the more than 26,000 (nearly 40 percent) referred by TAS through the correspondence audit process.

60. IRS's various efforts to address the volume claims appear to be working. As of September 30, 2024, the IRS had received approximately 11,800

16

claim withdrawal requests and had closed approximately 10,900 of the withdrawal requests, with approximately 900 still awaiting processing. This resulted in approximately $829 million in claims being withdrawn. The first round of the voluntary disclosure program closed on March 22, 2024. The IRS received approximately 2,600 applications, and has executed closing agreements for almost 800 of these submissions, resolving those taxpayers' ERC claims. This resulted in approximately $1B being disclosed. The second voluntary disclosure program closed in November 2024.

**Recent Activities**

61. October 10, 2024, the IRS announced that it was processing approximately 400,000 claims that it had been able to identify using the risk assessment model as being either eligible or ineligible, with approximately $10 billion in claims to be paid out.

62. The estimated number of claims wound up being closer to 500,000, with approximately 80% being allowed and approximately 20% being disallowed. The IRS continued evaluating eligibility in all of the risk categories and re-categorized a substantial number of claims in the medium-risk category to the low-risk category.

63. In January 2025, approximately 200,000 additional claims have been identified as eligible, with approximately $6 billion in claims to be paid out.

64. The IRS has also begun using the risk assessment model to look at the data for claims that have already been paid out to seek out and recapture erroneous refunds.

65. The IRS has worked hard to administer the ERC. As of May 2024, the IRS had processed about 3.6 million ERC claims worth approximately $230 billion to businesses. As of June 14, 2024, during the moratorium, the IRS had transcribed data

17

from the approximately 1 million paper ERC claims and analyzed the data to evaluate the risk of ineligibility.

66. As of January 18, 2025, the number of overall claims in inventory is 1,040,000, which includes both pre- and post-moratorium claims. As of January 18, 2025, the IRS has closed 524,385 claims since June 29, 2024.

67. While the IRS still has numerous claims in inventory, and continues to receive a significant number of claims, the IRS continues to apply feedback from the processing and data analysis it has done so far and audits to refine its risk modeling so that the IRS can move forward to process more of the claims more efficiently.

68. Allowing the IRS to use the risk assessment model is appropriate. The IRS has already processed an extraordinary number of claims and is in the best position to determine how best to handle the remaining number of ERC claims. It has a history of risking claims similarly to how these claims have been risked to ensure that processing is as efficient as possible and that improper claims are not paid out.

69. The IRS has heard and understands that many ERC claimants are identifying anticipated payments as sources of funding in bankruptcy plans, leveraging anticipated payments as M&A assets, and amending federal and state income tax returns to account for anticipated payments. However, granting the plaintiff's request in this case does not mean that the IRS will automatically allow all claims that received a disallowance letter.

70. If the IRS has to conduct examinations of claims before allowing or disallowing the claims (even in cases where the likelihood that the taxpayer did not qualify for the ERC is high), or abandon its current risk assessment model or return to the selection model it used pre-moratorium, the IRS's efforts to address the inventory will be significantly hampered. Taxpayers will have to wait a considerable amount of time for their claims to be reviewed. For those claims with a high likelihood of being ineligible, taxpayers will just have to wait longer while their claim is examined. Such a change would divert examination resources away from claims with at least some reasonable likelihood of being substantiated. Because of the forced reallocation of resources to address these highly improbable claims, eligible taxpayers will have to wait even longer to have their claims processed.

71. In its prior litigation, plaintiff Stenson Tamaddon challenged Notice 2021-20 and the moratorium on processing ERC claims. Administrative records were produced to provide the basis for the court's review of the claims in that case. Those records are for different administrative actions than the one in question in this case and do not constitute the record considered by the IRS in processing individual ERC claims.

Executed this 31st day of January, 2025, in Washington, DC.

                                               _____
                                               Douglas W. O'Donnell
                                               Deputy Commissioner
                                               Internal Revenue Service