1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| ERC Today LLC, et al., | No. CV-24-03178-PHX-SMM |
| Plaintiffs, | **ORDER** |
| v. | |
| John McInelly, et al., | |
| Defendants. | |

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction. (Doc. 18). The Motion is fully briefed. (Docs. 18, 21, 22). The Court held a hearing on the Motion on March 28, 2025, at which the parties presented argument. (Doc. 26). For the following reasons, the Court denies Plaintiffs' Motion for Preliminary Injunction.

**I.      BACKGROUND**

**a.  Enactment of the Employee Retention Credit**

Congress enacted the Employee Retention Credit ("ERC"), 26 U.S.C. § 3134, in 2020 as part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. (Doc. 1 ¶¶ 2, 50, 52, Doc. 18 at 8–9). The ERC is a tax credit for employers, the purpose of which was to provide financial stimulus to businesses impacted by government orders and restrictions during the height of the pandemic by encouraging employers to retain employees on payroll and rehire displaced employees. (Doc. 1 ¶¶ 2, 50, 52). The ERC initially applied to employers who experienced 1) full or partial suspension of the business's operations due to government orders limiting commerce, travel, or group

meetings due to COVID-19 during any quarter of 2020, or 2) a decline in gross receipts amounting to 50% or more compared to the same quarter in 2019. (Doc. 1-2 at 83). The ERC allowed employers to claim tax credits for an amount equal to 50% of the employee's qualified wages—for a maximum of $5,000 per employee—irrespective of the employer's tax liability. (Id.) The ERC is both a refundable and nonrefundable tax credit, meaning that credits exceeding the employer's tax liability may be refunded to the employer. (Doc. 1 at ¶ 3, 1-2 at 82, 110).

Congress amended the statute establishing the ERC three times between March of 2020 and November of 2021. (Doc. 1-2 at 82–83). The first amendment, enacted through the Taxpayer Certainty and Disaster Tax Relief Act on December 27, 2020, significantly expanded the credit by boosting the percent of qualified wages allowed from 50% to 70%, or from $5,000 per employee per tax year to $7,000 per employee per tax quarter.[1] (Doc. 1-2 at 82, Doc. 8 at 29), see § 3134(a). Congress also lowered the required decline in gross receipts needed for eligibility from 50% to 20%. See § 3134(c)(2)(A)(ii)(II). Finally, this amendment included a new category of eligible businesses: recovery startup businesses, defined as businesses which began trade after February 15, 2020 and reported annual gross receipts of less than $1 million. See § 3134(c)(2)(A)(ii)(III), § 3134(c)(5). In November of 2021, Congress passed the final amendment to the ERC through the Infrastructure Investment and Jobs Act. (Doc. 1-1 at 110, 1-2 at 47). The Act retroactively amended § 3134 to permit only businesses falling under the category of a "recovery startup business" to claim the ERC in the fourth calendar quarter of 2021 and after. (Ibid.) Thus, other businesses were only permitted to claim ERC refunds for wages paid up until September 30, 2021. (Ibid.)

**b. Eligibility for the ERC**

Under the amended ERC statute, employers are eligible to claim the ERC if the employer "was carrying on a trade or business during the calendar quarter for which the

---

[1] The increased rate of 70% applied to wages paid after December 1, 2020, and before September 31, 2021 for businesses other than recovery startup businesses. (Doc. 1-2 at 22). The 50% or $5,000 maximum remained for wages paid in 2020. (Id. at 29).

credit is determined under subsection (a)," § 3134(c)(2)(A)(i), and if the employer meets one of three conditions:

> (I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19),

> (II) the gross receipts (within the meaning of section 448(c)) of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019, or

> (III) the employer is a recovery startup business[.]

Section 3134(c)(2)(A)(ii)(I–III). As the agency tasked with administering the credit, the Internal Revenue Service ("IRS") had to determine what the statute required for eligibility and disseminate that information. Importantly, the IRS had to decide what amounted to a suspension of business operations and what constituted "orders from an appropriate governmental authority limiting commerce, travel, or group meetings" due to COVID-19. § 3134(c)(2)(A)(ii)(I).

The IRS issued Notice 2021-20 on March 1, 2021 to provide guidance on the ERC as it applied to wages paid between March 12, 2020 and January 1, 2021. (Doc. 1-1 at 117). In addition to delineating and defining the requirements for eligibility under § 3134(c)(2)(A)(ii)(I–II), Notice 2021-20 outlines numerous categories of documentation that employers must have in order to demonstrate eligibility for the ERC, including, *inter alia*, documentation of government orders causing a suspension of business operations, records demonstrating a decline in gross receipts, and records of employees who received qualified wages. (Doc. 1 at 15). However, employers were not required by the IRS to submit such documentation with their ERC claims; in fact, the IRS instructed employers not to submit such documentation. (Doc. 1 at 15).

Because of Notice 2021-20's effect on eligibility determinations under the ERC statute, the validity of Notice 2021-20 under the Administrative Procedures Act ("APA") is presently the subject of separate litigation in this court. See Stenson Tamaddon LLC v. U.S. Internal Revenue Serv. et al., CV-24-1123-PHX-SPL ("StenTam I"). Stenson Tamaddon brought that action on May 14, 2024, in large part to challenge the IRS's moratorium on processing ERC claims; now that the moratorium has been lifted, StenTam challenges Notice 2021-20, which it argues constituted legislative rulemaking by the IRS in violation of the APA.

### c. Challenges in administering the ERC

The ERC is a complex and resource-intensive tax credit to administer. (Doc. 1 at ¶ 110, 1-1 at 110–11, 1-2 at 99). Contributing to the IRS's difficulties in administering the credit is the manner in which employers must claim the ERC. Although the ERC may be claimed only for wages paid during the 2020 tax year and the first three quarters of 2021 (for employers other than recovery startup businesses), employers have been permitted to file claims retroactively via filing Form 941-X—titled "Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund"—which is filed as a correction to Form 941. (Doc. 1-2 at 47–48). Unlike the standard Form 941 that employers had already filed electronically for the relevant tax quarters, Form 941-X must be filed on paper. The paper format of Form 941-X has resulted in significant delays in processing ERC claims because IRS employees must manually transcribe the information contained in the Forms into digital format for further processing. (Doc. 21-1 at ¶ 18).

Prior to 2021, the IRS determined whether Forms 941-X filed would be subject to further review by utilizing a selection model with minimal, simple criteria that worked well for low volumes of claims with a low prevalence of abuse. (Doc. 21-1 at 7). At that time, the IRS received—on average—less than 100 Forms 941-X per month. However, by March of 2021, the monthly volume of Forms 941-X had increased by 8,000–10,000% due to the ERC. At the same time, the IRS was contending with a surge of aggressive and unscrupulous actors misleading businesses about the ERC and encouraging businesses to

claim the credit regardless of eligibility. (Doc. 21-1 at 8). Consequently, the IRS had to alter its data capture methods as well as the selection model and criteria it utilized to refer Forms 941-X for further prerefund examination, including updating identity theft filters. (Doc. 1-2 at 79). Despite the changes implemented by the IRS as well as the increase in personnel tasked with processing claims, its inventory of unprocessed ERC claims that required further review continued to expand. By the end of 2023, the IRS's inventory had surpassed 1.1 million paper claims. (Doc. 21-1 at 9).

### d. The IRS's moratorium on processing ERC claims

In September of 2023, the IRS instituted a moratorium on processing ERC claims. (Doc. 18 at 10). The moratorium was premised on the IRS's need to digitize the large influx of paper claims it had received and to evaluate its claim-processing procedures. (Doc. 1-1 at 49:10–25, 1-2 at 85–86). During the moratorium, the IRS continued to process ERC claims that it had already received, but at a much slower rate. (Doc. 1 at ¶¶ 34–35, 1-2 at 86). Forms 941-X were still being filed in large numbers during the moratorium. The IRS had successfully reduced its inventory to approximately 360,000 unprocessed claims in July 2023 by expediting its processing methods; but by April 2024, the agency's inventory ballooned to 1.4 million claims. (Doc. 1-2 at 85, 87).

During the moratorium, the IRS instituted changes to how the agency processed ERC claims during the moratorium, with a focus on identifying ineligible claims and recovering erroneously paid ERC. The process and criteria that the IRS uses to review, accept, and deny ERC claims is confidential information that the IRS does not disclose pursuant to 26 U.S.C. § 6103. (Doc. 21-1 at 6). Consequently, the precise extent of the changes that the IRS made during the moratorium is only surmisable in general terms. The most significant insight into the changes the IRS made to its processing of ERC claims is available through the declaration of Douglas O'Donnell, the Deputy Commissioner of the IRS, (Doc. 21-1), which the IRS attaches to its response to Plaintiffs' Motion for Preliminary Injunction, and a September 2024 report generated by

the Treasury Inspector General for Tax Administration (the "TIGTA Report") concerning the IRS's processing of ERC claims. (Doc. 1-2 at 78–112).

### e. The TIGTA Report

The TIGTA Report, released on September 30, 2024, focused on the IRS's initiatives to address potentially erroneous ERC claims that were paid as a result of the IRS's expedited review of claims in 2022 and 2023. (Doc. 1-2 at 78–79). As described in the Report, the IRS experienced several delays in processing ERC claims in 2020 and 2021 due to a lack of updated programming and procedural guidance. (Id. at 84). The delays, as well as an increase in the number of ERC claims filed, contributed to the growing backlog of ERC claims in the IRS's inventory. (Ibid.) The IRS thus implemented changes in its processing of Forms 941-X in order to facilitate quicker processing of ERC claims in order to combat the growing inventory of unprocessed claims. (Id. at 79, 88). However, due to the IRS's expedited review of ERC claims from January 2022 to June 2023, the TIGTA Report estimated that the IRS had paid out hundreds of millions of dollars in potentially erroneous ERC. (Ibid.)

Under the IRS's typical review procedure for Forms 941-X at the time, claims were—after being transcribed into electronic format—either accepted using an automated review system or selected for further examination. In order to manage the large influx of ERC claims that were filed, however, the IRS made changes to its review procedures in order to diminish the number of claims that were referred for prefund examination. (Id. at 79).  In January of 2022, the IRS decided to double the normal threshold for its Accounts Management function to refer ERC claims for further prerefund examination. (Id. at 88). From November 7, 2022, the IRS further limited referrals of ERC claims for further examination by only requiring claims to be reviewed under two of the 11 test scenarios developed to flag potentially erroneous claims. (Ibid.) "Thus, the only ERC claims referred were cases that failed one of the two specified tests." (Ibid.) The IRS kept these changes in place through June 29, 2023. (Ibid.)

As the TIGTA report covers, during the moratorium, the IRS also began post-refund compliance initiatives to recover ERC that was erroneously paid. On April 13, 2024, the IRS mailed Letter 6577 to 12,408 businesses assessing $572.9 million in potentially erroneous ERC paid for 22,072 Tax Year 2020 returns. (Doc. 1-2 at 92).

The TIGTA Report also identified an additional challenge that the IRS faced in processing and identifying potentially ineligible claims: a lack of information relevant to the eligibility criteria outlined in § 3134(c)(2)(A)(ii). As stated in the Report:

> Specifically for the ERC, the IRS does not have all the data it needs to verify the eligibility of the employer to claim the credit or accuracy of the claims by employers for the ERC. For example, the IRS had no date to support whether the employer fully or partially suspended operations due to a Pandemic government order, whether it experienced a decline in gross receipts, or how much it paid its employees during the relevant time period.

(Doc. 1-2 at 84–85). Consequently, "[i]n an instance like this, the only way the IRS could determine if an employee met these eligibility criteria would be through a resource-intensive examination, which would require the employer to cooperate and provide the necessary documentation for the IRS's review." (Id. at 85).

### f.  Implementation of "risking"

The subject of this litigation is a change in the IRS's ERC processing procedure that was instituted during the moratorium. Plaintiffs identify this new protocol as "'Disallowance During Processing,' where the agency uses automated systems to deny ERC claims based on undisclosed software 'filters.'" (Doc. 18 at 11). The term "Disallowance During Processing" is derived from an internal IRS document identifying initiatives taken with respect to ERC claims, which states that the IRS "[i]mplemented a simplified math verification to identify the maximum allowable ERC during processing" and that "[t]he IRS will use specific existing entity level data [redacted] to isolate, and/or treat current un-processed high-risk claims with full claim disallowance [redacted][.]" (Doc. 1-5 at 17).

The IRS describes the change in protocol as a "risk assessment model" adopted in order to filter out high-risk claims. As stated by Deputy Commissioner O'Donnell:

> [T]he IRS has developed a more dynamic risk assessment model that allows the IRS to categorize returns by risk level. The risk assessment model applies entity level filters, looking at information that the taxpayer has provided, and publicly-available information (including state closure orders), to test against criteria to determine ERC eligibility. The risk assessment model predicts the likelihood that a taxpayer's claim is valid or invalid.

(Doc. 21-1 at 11). The process of categorizing claims by risk level, whereby high-risk claims are designated for disallowance, is also called "risking." Based on the risk level assigned to claims, Deputy Commissioner O'Donnell states that the IRS can determine which claims can be allowed, disallowed, or sent for further examination. (Ibid.)

Based on the generalized information regarding the IRS's processing methods that is available, it appears that the implementation of risking marked a notable shift in the IRS's processing of claims. Previously, using an automated system, ERC claims were either 1) accepted, or 2) selected for further examination, at which point an IRS employee would determine how to proceed on the claim. (Doc. 1-5 at 19). Under the risking model that the IRS adopted during the moratorium, claims were either 1) accepted, 2) selected for further examination, or 3) disallowed using an automated system. The IRS's disallowance of claims under this procedure—without individual review by an IRS employee—is at issue in this case.

The IRS lifted its moratorium on processing ERC claims in August of 2024 and quickly began issuing notices of disallowance for thousands of claims in the form of Letters 105-C (full disallowance) and 106-C (partial disallowance). The IRS also announced that it would begin processing claims filed between the beginning of the moratorium and January 31, 2024, using the risking model and beginning with highest-

1 and lowest-risk claims. Letter 105-C contained standardized language explaining why the
2 recipient's claim was disallowed, explaining as follows:

3       Based on a review of IRS records, we have determined you are not an
4       Eligible Employer for purposes of the Employee Retention Credit
5       (ERC)during the period(s) shown above. Only employers that experienced
6       a full or partial suspension of operations due to a government order related
7       to COVID-19 or who experienced the required decline in gross receipts are
8       Eligible Employers.

10      Our records indicate there were no government orders related to COVID-19
11      in effect during the quarter(s) you claimed ERC which could have fully or
12      partially suspended your trade or business. Our records also show you do
13      not meet the required decline in gross receipts.[2]

14 (Doc. 1-5 at 60). Letter 106-C, for partial disallowance, explains the reason for
15 disallowance as follows: "The amount of Employee Retention Credit (ERC) you claimed
16 exceeds the maximum amount of qualified wages (including qualified health care
17 expenses) you are entitled to claim per employee." (Doc. 1-1 at 88, 94).

18      Letters 105-C and 106-C also disclose the remedies available to the recipient after
19 disallowance. Letter 105-C provides, in relevant part, that:

20      You have the right to appeal our decision to disallow your claim. You can
21      represent yourself before Appeals or you can have an attorney, certified
22      public accountant, enrolled agency, or any other person authorized to
23      practice before the IRS represent you .... If we don't hear from you within
24      30 days from the date of this letter, we will process your case with the
25      information we have now.

26 (Doc. 1-1 at 78). Following a description of the appeal procedure, Letter 105-C further
27 provides, in relevant part, that "[i]f you don't agree with our decision, you can file suit to

28
_____
[2] Another version of Letter 105-C transposes the final two justification sentences but is
substantively identical. (Doc. 1-1 at 77, 83).

recover tax, penalties, or other amounts, with the United States District Court that has jurisdiction or with the United States Court of Federal Claims." (Id. at 79). The Letter further provides that "the law gives you 2 years from the date of this notice of claim disallowance to file suit." (Id. at 85). Simply put, the Letter notifies the recipient of two primary avenues of recourse for a disallowed claim—an administrative appeal and a suit in federal court.

### g.  The Plaintiffs

Plaintiffs ERC Today LLC and Stenson Tamaddon LLC ("StenTam") are tax preparation firms that assist businesses in preparing and submitting claims for ERC refunds. (Doc. 1 at 6–7). Since the IRS lifted the moratorium on ERC claim processing in August 2024, Plaintiffs allege that they have received a large number of boilerplate rejections of ERC claims. Plaintiffs argue that the IRS has shifted to a policy of disfavoring the ERC and has unlawfully limited access to the credit in contravention of Congress's intent in enacting the ERC. "Since the Summer of 2023," Plaintiffs allege, "the [IRS] has made every effort to prematurely terminate or curtail the ERC program despite lacking statutory authority to achieve that goal." (Doc. 1 at ¶ 82).

Because Plaintiffs derive income from ERC refunds secured for Plaintiffs' clients, Plaintiffs allege that they, as tax preparation firms, are injured by the IRS's summary denial of ERC claims. Plaintiffs contend that the IRS's use of an automated "risk-scoring analytic process" to deny claims has "resulted in ERC denials for clearly eligible claims" without individualized review. (Doc. 1 at 4). Citing the TIGTA report, Plaintiffs allege that the IRS lacks information concerning government orders and gross receipts and thus cannot make eligibility determinations on those grounds. (Id. at ¶ 105–06, 117). Plaintiffs further allege that the IRS improperly calculates quarterly receipts based on gross annual receipts. (Id. at ¶ 149).

Plaintiffs filed this action on November 13, 2024, alleging that the IRS's manner of processing ERC claims violates the Administrative Procedures Act ("APA"), violates Plaintiffs' and Plaintiffs' clients' Fifth Amendment due process rights, and exceeds the

statutory jurisdiction of the IRS. (Doc. 1 at 52, 56, 60, 62). Plaintiffs allege in support of their APA claims that the IRS's summary disallowance of ERC claims is arbitrary and capricious because the IRS lacks the information necessary to evaluate eligibility for the credit. (Id. at 53). Plaintiffs further allege that the IRS has exceeded its statutory authority by disallowing ERC claims without providing employers with a right to be heard or a direct right to appeal in an independent forum. (Id. at 60–61). Plaintiffs allege that the IRS has effectively "rewritten tax procedure and regulation in ways that materially prejudice taxpayers" in violation of the APA's notice-and-comment rulemaking requirement. (Id. at 62–63).

With respect to Plaintiffs' substantive due process claim, Plaintiffs allege that "Plaintiffs and their clients have constitutionally protected interests in funds overpaid into the Treasury and now in possession of that agency pending a refund." (Doc. 1 at 56). By summarily disallowing valid ERC claims, Plaintiffs allege that the IRS has "violated taxpayer Due Process rights by stripping them of ERC funds and withholding tax overpayments owed to those businesses based on arbitrary standards and procedures." (Doc. 1 at 56). The IRS "deprives taxpayers of their constitutionally protected property interests by (a) arbitrarily denying taxpayer refunds without having a sufficient factual basis, (b) altering the review criteria for ERC submissions post hac and without notice, (c) failing to afford the statutorily guaranteed appellate procedure, and (d) changing the appellate procedures without notice." (Id. at 57).

Plaintiffs filed the pending Motion for Preliminary Injunction on January 7, 2025. (Doc. 18). The Motion is fully briefed, (Docs. 18, 21, 22), and the Court held argument on the Motion on March 28, 2025. (Doc. 26).

## II.    LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). A movant seeking a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure must establish that

"(1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." <u>Baird v. Bonta</u>, 81 F.4th 1036, 1041 (9th Cir. 2023), <u>citing</u> <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 30 (2008). In general, a district court must consider all four <u>Winter</u> factors. <u>See</u> <u>Vivid Ent., LLC v. Fielding</u>, 774 F.3d 566, 577 (9th Cir. 2014). However, if the movant fails to establish the first factor—a likelihood of success on the merits—then a district court need not consider the remaining factors. <u>Baird v. Bonta</u>, 81 F.4th 1036, 1040 (9th Cir. 2023).

The basic purpose of a preliminary injunction is to preserve the *status quo* pending the Court's determination of the claims on the merits. <u>Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.</u>, 840 F.2d 701, 704 (9th Cir. 1988). The status quo is the "last, uncontested status which preceded the pending controversy." <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.</u>, 571 F.3d 873, 879 (9th Cir. 2009) (quoting <u>Regents of the Univ. of Cal. V. Am. Broad. Cos.</u>, 747 F.2d 511, 514 (9th Cir. 1984)). A preliminary injunction "which goes well beyond simply maintaining the status quo Pendente lite[] is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." <u>Anderson v. United States</u>, 612 F.2d 1112, 1114 (9th Cir. 1979) (quoting <u>Martinez v. Mathews</u>, 544 F.2d 1233, 1243 (5th Cir. 1976)). Such a preliminary injunction is known as a mandatory injunction and, in the Ninth Circuit, will not be granted "unless extreme or very serious damage will result[.]" <u>Id.</u> at 1115.

## III.    DISCUSSION

Plaintiffs seek an injunction compelling the IRS to 1) cease issuing summary denials of ERC claims based on automatic filters, 2) restore prior ERC processing procedures, 3) provide adequate notice of deficiencies and appellate rights, 4) rescind previous denials issuing under improper processing procedures, and 5) provide an accounting of Form 105-C disallowances issued under the "Disallowance During Processing" procedures. (Doc. 18-1 at 2–3).

1     The IRS argues that Plaintiffs lack Article III standing and prudential standing to
2   challenge the IRS's procedures for processing ERC claims. (Doc. 21 at 13–17). "No
3   plaintiff alleges it claimed an ERC; had an ERC claim denied, summarily or otherwise; or
4   has been subject to risk filters, denied access to IRS Appeals, or prevented from
5   substantiating a valid claim[,]" the IRS argues. (Id. at 13). With respect to prudential
6   standing, the IRS asserts that Plaintiffs are not within the zone of interests protected or
7   regulated by the ERC statute such that they are entitled to claim a violation of the statute.
8   (Id. at 17). The IRS further argues that Plaintiffs are not likely to establish a waiver of
9   sovereign immunity or succeed on their APA or substantive due process claims. (Id. at
10  19–28). Finally, the IRS contends that Plaintiffs will not be irreparably harmed absent an
11  injunction and that the balance of equities and the public interest do not favor an
12  injunction. (Id. at 29–32).

13     The Court first considers whether Plaintiffs have made a clear showing that
14  Plaintiffs possess Article III standing to bring this action. See Lopez v. Candaele, 630
15  F.3d 775, 785 (9th Cir. 2010).

16          **a.  Article III standing**

17     The IRS argues that Plaintiffs are unlikely to establish Article III standing to
18  challenge the IRS's procedures for processing ERC claims. (Id. at 13). Federal courts are
19  of limited jurisdiction, and "Article III of the Constitution confines the jurisdiction of
20  federal courts to 'Cases' and 'Controversies.'" Food & Drug Admin. v. All. for
21  Hippocratic Med., 602 U.S. 367, 378 (2024). Any plaintiff who invokes the jurisdiction
22  of a federal court is thus charged with establishing standing to bring suit. Hollingsworth
23  v. Perry, 570 U.S. 693, 704 (2013); see also Spokeo, Inc. v. Robins, 578 U.S. 330, 338
24  (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or
25  controversy."). "To establish standing, … a plaintiff must demonstrate (i) that she has
26  suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will
27  be caused by the defendant, and (iii) that the injury likely would be redressed by the

28

requested judicial relief." <u>All. for Hippocratic Med.</u>, 602 U.S. at 368. In short, a plaintiff needs to show (i) injury, (ii) causation, and (iii) redressability. <u>Ibid.</u>

The "injury in fact" asserted by the plaintiff must be "(a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical[.]'" <u>Lujan v. Def. of Wildlife</u>, 504 U.S. 555, 560 (1992) (internal citations omitted) (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990)). In other words, "[a]bstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as a result of the challenged official conduct[.]" <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101–02 (1983); <u>see also</u> <u>Clapper v. Amnesty Int'l</u>, 568 U.S. 398, 416 (2013) (holding that parties lacked standing because "hypothetical future harm" asserted "was not certainly impending.").

"The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" <u>All. for Hippocratic Med.</u>, 602 U.S. at 380 (quoting <u>Sprint Commc'ns Co. v. APCC Servs., Inc.</u>, 554 U.S. 269, 288 (2008)). That is, an injury caused by the defendant's conduct will generally be redressed by awarding damages for or enjoining the conduct. <u>Id.</u> at 381. Causation requires a causal connection between the injury and the alleged conduct, meaning that "the injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court.'" <u>Lujan</u>, 504 U.S. at 560 (alterations in original) (quoting <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 41–42 (1976)). Demonstrating redressability requires that it be "likely" rather than "speculative" that the plaintiff's injury will be redressed by a favorable decision. <u>Lujan</u>, 506 U.S. at 561.

The burden on a plaintiff to establish standing depends on the stage of litigation. "[E]ach element [of the standing inquiry] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." <u>Lujan</u>, 504 U.S. at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" <u>Ibid.</u> However, "[a]t the preliminary injunction stage, the

plaintiffs 'must make a clear showing of each element of standing.'" <u>L.A. All. for Hum. Rts. v. Cnty. of Los Angeles</u>, 14 F.4th 947, 956 (9th Cir. 2021) (quoting <u>Yazzie v. Hobbs</u>, 977 F.3d 964, 966 (9th Cir. 2020) (per curiam)). To do so, the plaintiffs must rely on the allegations in their complaint "and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden." <u>City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.</u>, 944 F.3d 773, 787 (9th Cir. 2019) (alteration in original) (quoting <u>Washington v. Trump</u>, 847 F.3d 1151, 1159 (9th Cir. 2017) (per curiam)). The plaintiffs "must demonstrate standing separately for each form of relief sought," <u>Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.</u>, 528 U.S. 167, 185, (2000), and the "remedy must be tailored to redress [their] particular injury," <u>Gill v. Whitford</u>, 585 U.S. 48, 73 (2018).

### 1. Injury

Plaintiffs allege that they are injured by the IRS's summary disallowances of ERC claims because Plaintiffs, as tax preparation and advisory firms, receive compensation from the proceeds of ERC credits paid to their clients. (Doc. 1 at ¶¶ 24, 36). When the IRS denies a refund claim, then, Plaintiffs do not receive compensation on services provided in relation to the filing of the claim. (<u>Ibid.</u>) Moreover, when the IRS issues disallowances of ERC claims, Plaintiff StenTam alleges it must "dedicate substantial resources to the appeal or protest of IRS decisions without additional compensation" because "StenTam is contractually obligated to assist its clients in the pursuit of credits at the administrative level[.]" (<u>Id.</u> at ¶¶ 27–28). Similarly, Plaintiff ERC Today alleges that "the IRS's unlawful summary denials threaten to impose millions in compliance costs on ERC Today that cannot later be recovered." (<u>Id.</u> at ¶ 38).

The IRS assumes but does not concede that Plaintiffs have shown a cognizable injury. (Doc. 21 at 13). The IRS instead directs the brunt of its standing arguments towards causation and redressability, contending that Plaintiffs' injuries are not traceable to the IRS and that Plaintiffs' requested relief would not redress their monetary harms. (<u>Id.</u> at 13–14).

The Court finds that Plaintiffs have shown an injury sufficient for Article III standing. Plaintiffs have established that they suffer monetary harms from the IRS's disallowance of Plaintiffs' clients' ERC claims because Plaintiffs utilize a percentage-of-recovery fee model; thus, Plaintiffs do not receive compensation when the IRS disallows Plaintiffs' clients' claims. See Fair v. EPA, 795 F.2d 851, 853 (9th Cir. 1986) ("Pecuniary injury is a sufficient basis for standing."). Further, Plaintiffs are contractually obligated to appeal claim denials without further compensation. The Court finds that Plaintiffs' monetary harms are legally cognizable under Article III. See TransUnion LLC v. Ramirez, 594 U.S. 415, 425 (2021).

2.  Causation

With respect to causation, the IRS argues that any injury suffered by Plaintiffs "is not caused by the IRS, nor could it be requested by Plaintiffs' requested relief." (Doc. 21 at 14). The IRS asserts that it "has no obligation to pay Plaintiffs" and that "[i]f Plaintiffs are not paid for the services they provided, it will be because they created a fee structure in which their clients need not pay for services if the claim is disallowed." (Ibid.) In other words, "Plaintiffs' injuries are traceable to their business model, not the IRS's claim review procedures." (Ibid.) The monetary injuries that Plaintiffs may suffer as tax firms, the IRS argues, are secondary injuries not traceable to the IRS. (Ibid.)

Plaintiffs counter that their fee structure does not defeat traceability because "[T]he 'self-inflicted harm' doctrine applies only when a plaintiff self-injures to create standing." (Doc. 22 at 10), citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 418 (2013). Plaintiffs argue that the IRS's summary disallowances injure Plaintiffs' pre-existing relationships with clients and Plaintiffs "took no action to create standing like in Clapper." (Doc. 22 at 10). As support, Plaintiffs cite to the related case pending in this district, StenTam I, in which the Court found that StenTam had adequately asserted causation based on similar arguments. See Stenson Tamaddon, LLC v. U.S. Internal Revenue Serv., 742 F. Supp. 3d 966, 982–84 (D. Ariz. July 30, 2024).

Although the IRS substantively focuses on the fee structure that Plaintiffs employ, the IRS essentially argues that the indirect nature of Plaintiffs' injuries defeats traceability. The Court agrees with the IRS that Plaintiffs are not the direct object of the IRS's actions—instead, Plaintiffs' clients are. But the indirect nature of Plaintiffs' injuries does not defeat traceability here, nor does the fact that Plaintiffs' injuries are, in some sense, willingly incurred. In general, indirect injury makes standing more difficult to establish when the asserted injury relies on speculation about the decisions of third parties. See Warth v. Seldin, 422 U.S. 490, 504–05 (1975); Simon, 426 U.S.  at 42 (federal courts may "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."). In order to establish causality in such an instance, a plaintiff must show that the third parties in question will react in predictable ways. Murthy v. Missouri, 603 U.S. 43, 57–58 (2024).

Here, the relevant third parties are Plaintiffs' clients, who are directly subject to the IRS's regulations. A finding of causality as to Plaintiffs' injuries here requires no speculation about the reaction of Plaintiffs' clients to denial of their ERC claims; when the IRS disallows Plaintiffs' clients' ERC claims, Plaintiffs do not receive compensation for filing those claims. Also, Plaintiffs have alleged that Plaintiffs' clients, even if wrongfully disallowed, frequently choose not to pursue administrative appeals, in which case Plaintiffs do not receive any compensation even if the claim was ultimately eligible. That this harm ultimately results from Plaintiffs' fee structure does not break the chain of causality; as the IRS acknowledges, there is no exception to traceability for willingly incurred injuries. See Federal Election Comm'n v. Cruz, 596 U.S. 289, 297 (2022). Thus, the Court finds that Plaintiffs have shown causation sufficient for Article III standing.

### 3. Redressability

The IRS contends that Plaintiff's claimed injuries are not redressable through the remedy that Plaintiff seeks because subjecting ERC claims to individualized review would only result in disallowances of the same claims. (Doc. 21 at 15). "If the IRS is

enjoined from issuing risking-based disallowances and compelled to individually audit each ERC claim, Plaintiffs are not "substantially likely" to receive their contingency fees[,]" the IRS argues. (Ibid.) "The most likely outcome is that the same information that caused Plaintiffs' clients' claims to be disallowed in the first instance will cause the claims to be disallowed after audit." (Ibid.) The IRS argues that "[a]t most, if it receives its requested relief, StenTam will secure for its clients the chance to have each claim individually audited." (Ibid.)

Plaintiffs counter that "the IRS has no basis to conclude that claims would be disallowed after audit, because it lacked the information needed to make eligibility decisions in the first place." (Doc. 22 at 10). Plaintiffs reassert that "[t]he premise of this case is that IRS cannot possible make these decisions based on information in the agency's possession." (Ibid.) Plaintiffs also contend that the IRS's redressability arguments ignore the change in legal status caused by formal disallowances because 105-C disallowances "start[] the clock on the statutory window to file a refund action in district court." (Id. at 10–11). Finally, Plaintiffs contend that they face penalties if the IRS finds that Plaintiffs facilitated ineligible claims. (Id. at 11).

Causation and redressability "are often 'flip sides of the same coin,'" such that "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury," All. for Hippocratic Med., 602 U.S. at 380–81. However, this instance is one in which that general principle does not hold true. That is, while Plaintiffs have established causation for the purposes of this Motion, Plaintiffs have not made a clear showing that the relief Plaintiffs seek would redress their injuries.

The Court cannot compel the IRS to approve ERC claims. Plaintiffs' requested relief does not ask the Court to do so; instead, Plaintiffs seek for the Court to order the IRS to abandon its use of risking to disallow "high-risk" claims. However, it is speculative, as opposed to likely, that Plaintiffs' injuries would be redressed by enjoining the IRS from automatically disallowing claims through risking. It appears more likely, as

the IRS argues, that most or all of Plaintiffs' clients' claims would simply be disallowed after individualized review, an outcome which would not redress Plaintiffs' injuries.

To understand why Plaintiffs fall short in demonstrating redressability, it is important to consider the context surrounding the IRS's moratorium and its processing of ERC claims. Plaintiffs' claims are premised, in part, on the fact that Plaintiffs are now receiving less approvals and more disallowances of ERC claims than prior to the moratorium. For instance, Plaintiff ERC Today alleged a higher approval rate prior to the moratorium. (Doc. 1 at ¶¶ 34–35) ("the IRS approved roughly 7,000 ERC Today payments at a rate of around 75 per week before the moratorium.").

But it is evident from the TIGTA Report—a portion of which Plaintiffs rely on in support of their arguments—that, prior to the moratorium, the IRS was foregoing aspects of its own procedures for processing claims in order to more quickly process claims, resulting in payment of invalid claims. For a substantial portion of the ERC's existence—specifically, from January of 2022 through July of 2023—the IRS was issuing allowances on ERC claims based on an expedited review process that bypassed several criteria and scenarios that the IRS had in place to screen for ineligible claims. The TIGTA Report estimated that the IRS had allowed a significant number of ineligible claims due to this rushed processing—such a significant number, in fact, that the IRS instituted multiple post-compliance recovery initiatives to recover potentially erroneous ERC.

Plaintiffs do not seek for the Court to order the IRS to return to the expedited processing methods it had in place between January of 2022 through July of 2023, but instead seek for the IRS to return to its pre-CARES Act processing methods, as counsel for Plaintiffs clarified during the hearing on the Motion.[3] But bearing in mind that the point of comparison that Plaintiffs identify in their Complaint was during the period in which the IRS was over-approving ERC claims, it is necessarily speculative that

---

[3] The extent of this requested reversion and what it would entail for the IRS's processing of ERC claims is not clear to the Court, as the IRS has evidently been internally adjusting its processes and filters—for instance, updating identity theft filters—since the inception of the CARES Act due to the apparent unsuitability of Form 941-X as a means of claiming ERC.

compelling the IRS to abandon its risking model and return to prior established procedures would result in a higher rate of approved ERC claims. Put differently, the record does not support Plaintiffs' claim that the IRS is issuing more disallowances than prior to the moratorium because it is disallowing eligible claims. The evidence instead indicates that the IRS is now issuing more disallowances because the IRS *was* allowing *ineligible* claims. It is true that the IRS has acknowledged that its use of risking may result in the disallowance of some legitimate claims. (Doc. 21 at 33). But this brief concession is inadequate to support a "clear showing" of redressability.

Were the Court to rely on the allegations in Plaintiffs' Complaint, the Court may conclude that Plaintiffs have asserted redressability; however, on a preliminary injunction motion, the Court considers the evidence submitted by Plaintiffs in support of their allegations to determine if Plaintiffs have made a clear showing of redressability. See Townley v. Miller, 722 F.3d 1128, 1133 (9th Cir. 2013) ("At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing"). The Court finds that Plaintiffs have not made such a showing. Plaintiffs could yet obtain evidence showing that the IRS is denying eligible claims such that Plaintiffs' requested relief would remedy the monetary injuries they suffer from claim disallowances, but at this juncture Plaintiffs have not met their burden to show redressability.

Moreover, even were the Court to find that Plaintiffs have established Article III and prudential standing to bring this action, for the reasons stated below, the Court is not persuaded that Plaintiffs have established a waiver of the United States' sovereign immunity as necessary to bring their APA claims, nor have Plaintiffs shown a likelihood of success on the merits for Plaintiffs' substantive due process claim.

### b. Sovereign immunity

The IRS argues that Plaintiffs are unlikely to establish that the United States has waived its sovereign immunity because Plaintiffs have not challenged a final agency action as required for actions brought under the APA. (Doc. 21 at 19–20). Plaintiffs bring three causes of action under the APA: 1) arbitrary and capricious agency action, 2)

unlawful agency action in excess of statutory jurisdiction, authority, or limitations, and 3) violation of the APA's notice-and-comment rulemaking requirement. (Doc. 1). Plaintiffs' sole remaining cause of action is a Fifth Amendment substantive due process claim.

The APA waives sovereign immunity for certain actions brought against the United States, stating, in relevant part, that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. That waiver is subject to three limitations: (1) the plaintiff must "seek[] relief other than money damages"; (2) the plaintiff must have "no other adequate remedy"; and (3) the plaintiff's action must not be "expressly or impliedly forbid[den]" by "any other statute." See id. §§ 702. The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); see also Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004).

Under the APA, a reviewable agency action generally must be "final." § 704. A "final" agency action is one which 1) "mark[s] the consummation of the agency's decisionmaking process," and 2) is "one by which rights or obligations have been determined or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (cleaned up). Sovereign immunity is not waived, however, where a plaintiff fails to challenge a final agency action, see 5 U.S.C. § 704, or where the challenged action is committed to agency discretion by law. See 5 U.S.C. § 701(a).

The IRS argues that "Plaintiffs do not target a discrete agency action, any specific claim denial, processing rule, or IRS guidance document. Rather, they challenge the entire "procedure used to summarily deny claims and thereby restrict ERC on a broad scale." (Doc. 21 at 20). The broad program that the IRS uses to process ERC claims cannot constitute a final agency action, the IRS argues. Further, the IRS contends that its procedures on processing ERC claims are committed to agency discretion and thus cannot be challenged.

Plaintiffs contend in reply that the IRS's processing rules constitute final agency

action because "the IRS's processing scheme directly determines rights for taxpayers nationwide." (Doc. 22 at 13). Plaintiffs argue that the IRS's "risking" rules to make final ERC decisions. Plaintiffs also dispute that Plaintiffs are attacking the IRS's processing procedures on a broad scale. Instead, Plaintiffs argue that they are challenging a "discrete set of newly promulgated procedure and criteria—which led to summary disallowances for thousands of ERC claims without individualized review." (Id. at 14). Further, Plaintiffs contend that they are not attacking agency action that is committed to agency discretion because Plaintiffs are challenging "the IRS's new affirmative barriers to recovery under the ERC program[,]" which Plaintiffs allege are arbitrary and capricious in violation of the APA. (Id. at 15). Finally, Plaintiffs contend that they have no other adequate remedy at law because "Plaintiffs are not the taxpayers and therefore lack standing to pursue a refund action." (Doc. 22 at 16).

As stated by the Supreme Court in Bennett, agency action subject to judicial review under the APA "must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." 620 U.S. at 177–78 (internal citation omitted). Here, Plaintiffs challenge the IRS's decision-making process itself. The "consummation" of the decision-making process is the IRS's allowance or disallowance of ERC claims, not its process for reviewing such claims. The IRS's review process is thus interlocutory in nature; even if the process does result in the automatic disallowance of some high-risk ERC claims, it is the disallowance—not the form of review—that amounts to a final agency action.

Were this a formal program of the IRS with the stated intention of disallowing certain categories of ERC claims, perhaps Plaintiffs would have a colorable argument that such a program would constitute final agency action. But the record is bereft of any indication that the IRS's use of risking resembles a formal program. That this is more of an internal process than an agency action is supported by the fact that neither party can precisely pin down the process itself; the parties refer to "risking," "disallowance during processing" or a "risk assessment model," but the lack of a discrete identifier is some

1  indicator that the IRS's methods are not really a "program" at all, but an internal process.

2  Accordingly, the IRS's processing procedures, including the risk assessment model that

3  the IRS has acknowledged it implemented in order to categorize ERC claims by risk level

4  and disallow high-risk claims, cannot be said to amount to "final agency action" within

5  the meaning of the APA.

6  While the IRS's procedures for handling ERC claims does not amount to final

7  agency action, as stated, the formal disallowance of an ERC claim may constitute agency

8  action sufficient for an APA claim. However, the proper plaintiff to bring such a claim

9  would be an employer whose ERC claim was disallowed by the IRS, not Plaintiffs.

10  However, even if an employer did bring such a claim, the employer would likely still fall

11  short of establishing a waiver of sovereign immunity for an APA claim because the

12  waiver provided in § 702 requires that the plaintiff have "no other adequate remedy."

13  Employers whose ERC claims are disallowed do have alternative remedies; employers

14  may appeal the disallowance or file suit challenging the disallowance in district court.

15  Accordingly, Plaintiffs have not established a waiver of sovereign immunity to

16  challenge the manner in which the IRS processes claims because Plaintiffs have not

17  identified a final agency action. "[A] court is foreclosed by § 704 from entertaining

18  claims brought under the APA seeking review of a non-final agency action (and not

19  otherwise permitted by law)." Navajo Nation v. Dep't of the Interior, 876 F.3d 1144,

20  1170 (9th Cir. 2017). Thus, the Court lacks jurisdiction to consider Plaintiffs' APA

21  claims and need not proceed to the Winter factors. See Pride Indus., Inc. v. Comm. for

22  Purchase from People Who Are Blind or Severely Disabled, 420 F. Supp. 3d 1035, 1045

23  (E. D. Cal. 2019) ("Unless or until plaintiff identifies final agency action that is subject to

24  the court's review under the APA, plaintiff is unable to demonstrate any potential for

25  success on the merits, let alone a likelihood of success.").

26  **c.  Fifth Amendment due process claim**

27  Though Plaintiffs have not established a waiver of sovereign immunity as

28  necessary to bring Plaintiffs' APA claims, the United States' sovereign immunity does

not bar Plaintiffs' substantive due process claim because the "final agency action limitation does not apply to 'other types of claims (like … constitutional claims).'" <u>Sierra Club v. Trump</u>, 929 F.3d 670, 699 (9th Cir. 2019) (quoting <u>Navajo Nation</u>, 876 F.3d at 1170). Accordingly, the Court proceeds to consider Plaintiffs' substantive due process claim under the <u>Winter</u> factors. As a threshold matter, however, the Court considers whether Plaintiffs seek a mandatory or prohibitory injunction.

### 1.  Mandatory or prohibitory injunction

The IRS argues that Plaintiffs' requested injunction must be subject to a more rigorous standard because the injunction is mandatory rather than prohibitory in nature. Accordingly, it is necessary to determine whether Plaintiffs are seeking a mandatory or prohibitory injunction before considering Plaintiffs' likelihood of success on the merits. This distinction is important to the following analysis because mandatory injunctions are "subject to a higher standard that prohibitory injunctions," and are only permissible "when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.' <u>Hernandez v. Sessions</u>, 872 F.3d 976, 999 (9th Cir. 2017) (quoting <u>Marlyn Nutraceuticals</u>, 571 F.3d at 879).

As stated above, Plaintiffs' requested relief seeks to "halt[] unlawful summary denials, restor[e] the established procedures for review of these claims, vacat[e] all denials issued through improper IRS filters, and requir[e] IRS to provide taxpayers proper notice and prompt access to an independent administrative appellate process." (Doc. 18 at 32). Plaintiffs frame the injunctive relief they ask as prohibitory, asserting that Plaintiffs "ask the Court to restore the systems and protections in place before the IRS launched the [Disallowance During Processing] program. That relief is prohibitory." (Doc. 22 at 8).

The injunction that Plaintiffs seek is properly characterized as a mandatory one. The first item of relief sought by Plaintiffs—"halting unlawful summary denials"—may properly be characterized as a prohibitory injunction in that it prohibits the IRS from taking further action on an allegedly unlawful basis. Additionally, under the Ninth

1   Circuit's decision in <u>Arizona Dream Act Coalition v. Brewer</u>, the second item of relief—

2   "restoring the established procedures for review of these claims"—may also be

3   characterized as prohibitory; the Ninth Circuit in <u>Brewer</u> considered the "status quo" to

4   be prior to the state's enactment of the challenged law. 757 F.3d 1053 (9th Cir. 2014); <u>see</u>

5   <u>also</u> <u>Hernandez</u>, 872 F.3d at 998 (9th Cir. 2017). However, the remaining three items—

6   providing notice of deficiencies and access to an appellate process, vacating denials, and

7   providing an accounting of 105-C denials—plainly require the IRS to affirmatively take

8   action beyond maintaining the status quo.

9                   2.  Likelihood of success on the merits

10          The constitutional guarantee of substantive due process is intended to protect

11  individuals from arbitrary and oppressive government action. <u>Daniels v. Williams</u>, 474

12  U.S. 327, 331 (1986). With respect to executive action, "only the most egregious official

13  conduct can be said to be 'arbitrary in the constitutional sense,'" <u>Cnty. of Sacramento v.</u>

14  <u>Lewis</u>, 523 U.S. 833, 846 (1998) (quoting <u>Collins v. Harker Heights</u>, 503 U.S. 115, 129

15  (1992)). "To constitute a violation of substantive due process, the alleged deprivation [of

16  liberty] must 'shock the conscience and offend the community's sense of fair play and

17  decency.'" <u>Sylvia Landfield Trust v. City of Los Angeles</u>, 729 F.3d 1189, 1196 (9th Cir.

18  2013) (quoting <u>Marsh v. Cnty. of San Diego</u>, 680 F.3d 1148, 1154 (9th Cir. 2012)).

19          In support of Plaintiffs' substantive due process claim, Plaintiffs argue that the

20  IRS has violated taxpayer due process rights because the IRS's "latest effort to narrow

21  the ERC program deprives taxpayers of protected interests by arbitrarily denying ERC

22  refunds through knowingly deficient processing rules; altering the application criteria for

23  ERC submissions post hac; and changing appellate procedures to the detriment of

24  taxpayers. (Doc. 18 at 22). Plaintiffs argue that "[t]axpayers claiming the ERC have a

25  protected property interest in funds overpaid into the Treasury pending a refund." (<u>Ibid.</u>)

26  The IRS's processing rules penalize the taxpayer for the IRS's own deficiencies and

27  show a deliberate indifference towards taxpayer rights, Plaintiffs argue. (<u>Id.</u> at 23).

28

Plaintiffs, of course, are not the taxpayers whose due process rights the IRS has allegedly violated; Plaintiffs' clients are. At first blush, Plaintiffs' claim runs counter to the principle that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499. But Plaintiffs argue that both Plaintiffs and their clients suffer a due process injury as a result of the IRS's processing procedures. Plaintiffs offer two arguments as to why Plaintiffs are entitled to bring such a claim on behalf of themselves and their clients; first, Plaintiffs argue that they suffer an independent due process injury, and second, Plaintiffs argue that they can bring the claim on behalf of their clients because their clients are hindered from independently bringing such a claim.

The IRS argues that "Plaintiffs cite no authority that supports their novel legal theory that their clients have a protected property interest in their refund claims" before such claims are approved. (Doc. 21 at 28). "Plaintiffs' constitutional claims are specious," the IRS argues, "and, even by their own terms, derive from no potential injury to *Plaintiffs*." (Doc. 21 at 31). (emphasis in original). While, the IRS acknowledges, Plaintiffs' clients' may have a property interest in their tax refund such that due process applies, the IRS argues that the available remedy for a claim disallowance—bringing a claim in federal court—eliminates any due process concerns. (Ibid.) The IRS further argues that "no authority holds that once a taxpayer submits a claim for refund, the IRS can only allow that claim or subject the taxpayer to an audit or that any process that permits the IRS to disallow the refund claim, short of an audit, violates due process." (Doc. 21 at 28). "Instead, the IRS has been given discretion by Congress to manage refund claims to include using risking to help make individualized determinations of taxpayer claims[,]" the IRS asserts. (Ibid.)

Plaintiffs have not demonstrated a likelihood of success on their substantive due process claim for two reasons; first, Plaintiffs have not established a constitutionally protectable property interest in their clients' tax credits, and second, Plaintiffs have not established that they are entitled to bring a due process claim on behalf of their clients. At

the outset, Plaintiffs' argument that they suffer a deprivation of their constitutional rights independent from that suffered by their clients is unavailing. Although Plaintiffs contend that they "have a constitutional injury to property rights in the form of payments denied by IRS decisions" and "share the same qualitative interest in ERC refunds as their [their clients]," (Doc. 18 at 28), any protectable property interest in approved tax credits is that of Plaintiffs' clients because it is Plaintiffs' clients who "have rights to money overpaid into the treasury[.]" (Id. at 7). Plaintiffs' financial interest in their clients' approved tax claims is not a constitutionally protectable property interest.

Plaintiffs also contend that Plaintiffs' clients are hindered from independently challenging the IRS's alleged due process violations, arguing that "the Supreme Court recognizes that a third party's financial disincentive to litigate is a sufficient hindrance justifying third party standing." (Doc. 18 at 29). Plaintiffs neglect to directly cite the Supreme Court case recognizing this principle: Powers v. Ohio, 399 U.S. 400 (1991). The similarity between Powers and this action is next to none; the Court in Powers held that criminal defendants have standing to assert the equal protection rights of jurors subject to peremptory strikes on the basis of race. Id. at 415. The Court noted that, in addition to other challenges a juror would face in bringing such an equal protection claim, "there exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation." Ibid. Unlike jurors in a criminal trial, however, Plaintiffs' clients have a direct financial stake in this action in the form of ERC claims, which may amount to thousands of dollars. Plaintiffs' arguments that their clients are financially disincentivized and thus hindered from vindicating their constitutional rights are unavailing.

Because Plaintiffs have not established a likelihood of success on the merits of Plaintiffs' substantive due process claim, there is no need to consider the remaining Winter factors. See Baird, 81 F.4th at 1040 ("if the movant fails to establish the first factor—a likelihood of success on the merits—then a district court need not consider the remaining factors.").

**IV.    CONCLUSION**

"A preliminary injunction is an extraordinary remedy never awarded as of right[.]" Winter, 555 U.S. at 24. Upon a review of the parties' briefing on Plaintiffs' Motion as well as Plaintiffs' Complaint and the exhibits attached thereto, the Court finds that Plaintiffs have not made a clear showing of Article III standing because Plaintiffs have not shown that their injuries would be redressed by the relief sought. Specifically, Plaintiffs have not shown that compelling the IRS to discontinue its use of risking and return to its pre-CARES Act processing methods—which may not be suitable or feasible for processing the large volume of ERC claims that the IRS has received—would redress their injuries. Further, even if Plaintiffs demonstrated Article III standing, Plaintiffs have not shown that the IRS's ERC claim processing methods amount to final agency action within the meaning of the APA, nor are Plaintiffs likely to succeed on the merits of Plaintiffs' remaining substantive due process claim. Accordingly, the Court finds that Plaintiffs have not carried their burden of persuasion and thus are not entitled to the preliminary injunction they seek. It should be noted that Plaintiffs' clients are not without recourse as a result of the IRS's disallowance of their ERC claims; as conveyed in Letters 105-C and 106-C, Plaintiffs' clients have the option to administratively appeal the disallowances, at which point the IRS reviews the claim to determine if more information would remedy the claim's deficiencies, or file suit in federal district court.

The Court acknowledges the challenge that Plaintiffs face in producing the evidence necessary to meet their burden of persuasion, given that the IRS's actual processing procedures are confidential and protected from disclosure under 26 U.S.C. § 6103. However, on the record and briefing presented, the Court finds that Plaintiffs have failed to make a clear showing of Article III standing to bring this action and thus denies Plaintiffs' Motion.

Accordingly,

///

///

**IT IS ORDERED denying** Plaintiffs' Motion for Preliminary Injunction. (Doc. 18).

Dated this 7th day of April, 2025.

Stephen M. McNamee
Senior United States District Judge